**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WALNUT HILL PHYSICIANS' | ) | Bankruptcy: 17-32255-bjh7 |
| HOSPITAL, LLC, | ) | |
| | ) | |
| Debtor in Liquidation. | ) | |

| | | |
|---|---|---|
| SCOTT M. SEIDEL, CHAPTER | ) | |
| 7 TRUSTEE, | ) | |
| | ) | Adversary: 18-03033-bjh |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ST. JUDE MEDICAL S.C., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO
REPLY BRIEF IN SUPPORT OF
ST. JUDE MEDICAL S.C., INC.
TO MOTION FOR
PARTIAL SUMMARY-JUDGMENT**

**TO THE HONORABLE JUDGE OF THE
UNITED STATES BANKRUPTCY COURT:**

NOW COMES *ST. JUDE MEDICAL S.C., INC.* ("St. Jude"), and submits the following *APPENDIX* to the *REPLY BRIEF IN SUPPORT* as to St. Jude's *MOTION FOR PARTIAL SUMMARY JUDGMENT* [adv. docket 28] against *SCOTT M. SEIDEL, CHAPTER 7 TRUSTEE* (the "Trustee"), to-wit:

**TABLE OF CONTENTS**

Exhibit "A" – Gregg Declaration ........................................................................1 - 2

Exhibit "B" – Transcript, Motion to Compel ..........................................................3 - 41

Exhibit "C" – Letter of Mr. Vasek ........................................................................ 42

Exhibit "D" – Second Interim Application &c. [docket 365] ................................. 43 - 65

REMEMBERED and GIVEN UNDER MY HAND this the ___1st___ day of the month of October, *year* 2018.

**PADFIELD & STOUT, L.L.P.**

JOHN E. JOHNSON, *of Counsel*
State Bar [Tex.] 24025457
Dallas Office:
705 Ross Avenue
Dallas TX 75202
+1 214 215 6402 – telephone
jjohnson@padfieldstout.com – e-mail

law-counsel for Defendant and
local trial counsel for

**&&&**

**KOHNER, MANN & KAILAS, S.C.**
attorneys for St. Jude Medical S.C., Inc.
a/k/a St. Jude Medical, Inc.
SAMUEL C. WISOTZKEY
(adm. *pro hac vice*)
MELINDA A. BIALZIK
(adm. *pro hac vice*)

Washington Building, Second Floor
Barnabas Business Center
4650 N. Port Washington Rd.
Milwaukee WI 53212-1059
+1 414 962 5110 – telephone
+1 414 962 8725 – telecopy
swisotzkey@kmksc.com — e-mail
mbialzik@kmksc.com – e-mail

## CERTIFICATE OF SERVICE

The undersigned converted the foregoing document into an electronic image, via portable document format (.pdf), electronically submitted same to the Internet web portal for the Clerk of this Court utilizing the Electronic Management and Electronic Case Filing system of the Court, which has caused service, via Simple Mail Transfer Protocol (e-mail), of a Notice of Electronic Filing of this imaged document to the below-identified parties on Monday, October 1, 2018; said e-mail provides an attributable hyperlink to the document, in portable document format, except any non-electronic served counsel; in that instance, such document was mailed via First Class United States Mail, to-wit:

Davor Rukavina, Esq.
Julian Vasek, Esq.
MUNSCH HARDT KOPF & HARR, P.C.
Suite 3800, Ross Tower
500 N. Akard Street
Dallas TX 75201

/s/ *John E. Johnson.*
JOHN E. JOHNSON.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WALNUT HILL PHYSICIANS' | ) | Bankruptcy:   17-32255-bjh7 |
| HOSPITAL, LLC, | ) | |
| | ) | Exhibit "A" |
| Debtor in Liquidation. | ) | |

| | | |
|---|---|---|
| SCOTT M. SEIDEL, CHAPTER | ) | |
| 7 TRUSTEE, | ) | |
| | ) | Adversary:   18-03033-bjh |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ST. JUDE MEDICAL S.C., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL DECLARATION OF GREGORY HAUT
IN SUPPORT OF SUMMARY JUDGMENT**

Gregory Haut makes this supplemental declaration under penalty of perjury.

1.       I am an Accounts Receivable Manager for Abbott Laboratories Inc. the authorized agent of St. Jude Medical, S.C. Inc. ("St Jude"), which acquired St. Jude in January of 2017.

2.       I am directly responsible for accounts receivable matters relating to St. Jude and through my own knowledge and members of my team, and I am familiar with the billing and invoicing practices employed by St. Jude.  The information stated herein is true and correct to the best of my knowledge, information and belief.  I previously provided declarations in this matter dated June 11, 2018 and August 23, 2018.

3.       In the regular performance of my job functions, I am familiar with business records maintained by St. Jude for the purposes of pursuing accounts receivable both inside and

outside of insolvency and bankruptcy proceedings. These records (which include data compilations, electronically imaged documents, and others) are made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records, and are kept in the course of business activity conducted regularly by St. Jude.

4.      The Trustee has raised a question about the Fedex confirmation pages attached to my August 23, 2018 declaration.  This declaration provides further information about those documents.

5.      When a St. Jude customer files for bankruptcy protection, accounts receivable department employees collect all invoices reflecting unpaid amounts owed to St. Jude, for use in filing appropriate claims in connection with the case.  Employees also collect proof of delivery information.   For invoices delivered by Fedex, employees take the applicable tracking information for the invoice and then print off the appropriate delivery confirmation information from the Fedex website.  These printouts are maintained in St. Jude's records as proof of delivery, are matched with the applicable invoices, and, when applicable, provided to legal counsel as support for St. Jude's claims in the case.

6.      Attached to my August declaration as group Exhibit D are true and correct copies of the invoices listed on Exhibit C to that declaration.  Behind each invoice copy that reflects a shipping method by Fedex is the associated proof of delivery document.  These documents reflect print dates from the Fedex website in June 2017, after Walnut Hill's bankruptcy filing date, consistent with the practice noted above.

Dated: October _1_, 2018.

_____

Gregory Haut

St.JudeReplyApp'x.002

2

```
                    UNITED STATES BANKRUPTCY COURT
                    NORTHERN DISTRICT OF TEXAS

IN RE:                      .      Case No. 17-32255-BJH
                            .
WALNUT HILL PHYSICIANS      .
HOSPITAL, LLC               .
                            .
          Debtor.           .
. . . . . . . . . . . . . ..
SCOTT M. SEIDEL, TRUSTEE,.         Adv. No. 18-03033-BJH
                            .
          Plaintiff,        .
                            .      1100 Commerce Street
          v.                .      Dallas, TX 75242
                            .
ST. JUDE MEDICAL S.C.,      .
INC.,                       .
                            .
          Defendant.        .      June 21, 2018
. . . . . . . . . . . . . ..       9:09 a.m.
```

Exhibit "B"

```
          TRANSCRIPT OF MOTION TO COMPEL RE: DISCOVERY
          DISCOVERY RESPONSES AND PRODUCTION FILED BY
                  PLAINTIFF SCOTT M. SEIDEL
              BEFORE HONORABLE DOUGLAS D. DODD
              UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Plaintiff:          Munsch, Hardt, Kopf & Harr, PC
                            By:  DAVOR RUKAVINA, ESQ.
                                 JULIAN P. VASEK, ESQ.
                            500 N. Akard Street, Suite 3800
                            Dallas, TX 75201


Audio Operator:             Nicole Whittington


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

St.JudeReplyApp'x.003

2

APPEARANCES (Cont'd):

For the Defendant:          Kohner, Mann & Kailas, S.C.
                            By:  MELINDA A. BIALZIK, ESQ.
                                 SAMUEL C. WISOTZKEY, ESQ.
                            Washington Building, Second Floor
                            Barnabas Business Center
                            4650 N. Port Washington Road
                            Milwaukee, WI 53212

                            Padfield & Stout, L.L.P.
                            By:  JOHN E. JOHNSON, ESQ.
                            705 Ross Avenue
                            Dallas, TX 75202

For Cerner Corporation:     Fishman Jackson Ronquillo PLLC
                            By:  MARK H. RALSTON, ESQ.
                            13155 Noel Road
                            Tower 3, Suite 700
                            Dallas, Texas 75240

                            - - -

St.JudeReplyApp'x.004

3

1              (The following is the requested excerpted portion

2                          of the proceedings.)

3              MS. BIALZIK:  Good morning, Your Honor.  I didn't get

4    a chance to make my appearance before.  I am Melinda Bialzik,

5    here with my colleague Samuel Wisotzkey from Kohner, Mann &

6    Kailas in Wisconsin on behalf of St. Jude.  Thank you.

7              THE COURT:  Good morning.

8              MR. RUKAVINA:  May I begin, Your Honor?

9              THE COURT:  You may.

10             MR. RUKAVINA:  Your Honor, obviously we're here on

11   the trustee's motion to compel discovery, and I think -- if I

12   can give Your Honor just a brief kind of a background of how we

13   see this case.  I've been doing this for 17 years.  I've never

14   tried a preference case.  I was a law clerk for two years to

15   Judge Robert L. Jones.  He never tried a preference case.  The

16   trustee has been a trustee for almost 30 years and he can't

17   remember if he's ever tried a preference case.  And the reason

18   why we don't try preference cases frankly is because capable

19   attorneys, knowing all the facts, knowing the law tend to know

20   where a preference case should settle and, therefore, they

21   settle them.

22             In this case, Your Honor, we've sent 60 preference

23   demand letters.  We've already settled 20 preferences without

24   the need for filing suit.  We have filed only a handful of

25   suits, about ten suits, and those were filed for one of two

St.JudeReplyApp'x.005

1   reasons, either the preference defendant did not get back to us

2   on our preference communications and demands, or the case

3   involves unique facts, such as Your Honor will hear is the case

4   here with respect to a consignment agreement and also a

5   503(b)(9).

6          So all that is to say that trustee and counsel in

7   order to be able to do their job and efficiently administrate

8   an estate and not burden courts with needless actions need to

9   have discovery.  They need to have information, so they can

10  make informed decisions.

11         And St. Jude, Your Honor, in this case, despite

12  months of waiting for discovery, has not afforded us reasonable

13  discovery, such that we can take additional discovery or even

14  form a final opinion as to what the theory of the case is and

15  where this case should go.

16         There are a few unique facts about this case that I'm

17  sure the Court has seen in our moving papers.  St. Jude has

18  filed a $130,000 503(b)(9) claim.  503(b)(9), as the Court of

19  course knows, requires amongst other things that St. Jude prove

20  ordinary course.  Ordinary course is also an affirmative

21  defense.  It also requires that St. Jude prove value.  So we

22  have a $130,000 503(b)(9) in addition to the large preference.

23         The other unique fact about this case is that the

24  trustee has been informed and I think -- I don't know if

25  there's a dispute about this, that St. Jude mistakenly

1  delivered the same shipment twice on the eve of bankruptcy.  In

2  other words, the debtor made an order, placed an order for X, Y

3  and Z, St. Jude delivered X, Y and Z, and then mistakenly

4  delivered X, Y and Z again.  Just yesterday we went to the

5  hospital, the landlord finally permitted us access, and we took

6  these boxes of what was delivered mistakenly we were informed

7  by the debtor's former manager.  That's important because this

8  again goes to a 503(b)(9) and a new value analysis and,

9  therefore, why communications with the debtor are important.

10     The third thing that makes this case unique is, as

11  Your Honor has seen in our appendix, Exhibit I, there was a

12  consignment agreement in place here, and as we have briefed,

13  consignment governed by the UCC can take one of two forms and

14  which of those forms it is basically decides whether title

15  transfers and when title transfers.  That's critical for any

16  new value analysis.  That's critical for any preference

17  analysis.

18     So we do have potentially a consignment agreement

19  here and that's certainly what the trustee has been informed

20  from his informal analysis prior to filing this adversary

21  proceeding.

22     And the final thing that's a little bit unique about

23  this case, Your Honor, is that according to St. Jude's own

24  appendix in response to this motion, they did put the debtor on

25  a credit hold.  That I think goes right to one of the facts or

St.JudeReplyApp'x.007

1  factors the courts look at for ordinary course matters.

2  Putting the debtor on a credit hold certainly affects what

3  happens with contemporaneous exchange or prepayment or whether

4  antecedent debt, et cetera.

5          All this is to say that the trustee has a legitimate

6  bonafide need for relevant discovery regarding these unknown

7  issues.  In other words, this is not an ordinary preference

8  case where they give us the invoices, they give us the packing

9  slips, they give us whatever contract there might be, they give

10  us bills of lading and then the trustee can figure out, okay,

11  what is the ordinary course, what is the value.

12          This is a case very much where we see how the people

13  on the ground were treating this.  We need to see very much

14  what the actual practice was to see which of these consignment

15  agreements this was.  Your Honor, we've given you an exhibit

16  here, one of their own invoices, I walk you through it, which

17  shows the date of delivery of a heart valve, the date of

18  delivery of the heart valve to the hospital is after the date

19  that that heart valve was implanted into the patient.  That's

20  impossible.  That's impossible that a heart plant -- that a

21  heart valve implanted on May 28th let says was delivered on

22  June 1.

23          So, again, we're not dealing with a black and white

24  simple situation here.  We're dealing with local sales people.

25  We're dealing with local sales people perhaps delivering heart

St.JudeReplyApp'x.008

 1  valves and stems and other implantables and pacemakers on an

 2  as-needed basis because the patient is dying on the table.

 3  FedEx doesn't come fast enough to save a patient's life.

 4       Again, we need these communications with the sales

 5  people.  We need whatever contracts govern the relationship

 6  with the sales people.  We need all communications with the

 7  debtor.  These are reasonable discovery requests that I humbly

 8  submit you would have in any case of any size.  And for St.

 9  Jude to flat reject those discovery requests is a little bit

10  unprecedented I would suggest.

11       This is not a $20,000 case.  This is not a simple

12  case.  And this is a case where we're testing the mettle or the

13  merits of their own 503(b)(9) and their own affirmative

14  defenses.

15       I add to that the boilerplate and the generic and the

16  general objections that St. Jude has asserted which dozens and

17  dozens of cases from this court say are improper, and perhaps

18  Your Honor thinks that we're being a stickler on that.  Perhaps

19  Your Honor thinks we're being unreasonable, but we're not

20  because counsel and parties hide behind those general and

21  boilerplate objections, so that you never really know what they

22  produced and never really know what they've withheld.

23       And with due respect to St. Jude, in all their

24  communications back to us it's double speak.  It's Orwellian

25  double speak.  If they have really produced everything that's

St.JudeReplyApp'x.009

1 responsive that's in their possession, custody and control,
2 then state so in the response to the RFP.  That's what this
3 court's precedent requires.  If they have withheld a document
4 by category or individually, then state so, so that we know
5 what's been withheld.  If they are relying on an objection,
6 then state so, so that the Court today can decide whether that
7 objection is valid.  And if they are asserting a privilege,
8 then state so and state what is withheld on the base of
9 privilege and provide a privilege log as necessary.  They
10 cannot hide behind boilerplate or general objections.

11        And, finally, Your Honor, it certainly did not
12 prejudice us, but they did get their objections on file or
13 rather to us late and we submit that they've waived any
14 objections that otherwise be valid.  Again, I can't tell you
15 that we were prejudiced by that short delay, but they have not
16 sought any relief from that.

17        So, Your Honor, that is the bulk of our case.
18 There's not much more I can say.  I'm sure Your Honor has read
19 our moving papers.  We're seeking basic minimal discovery here
20 that is targeted and that cannot be overburdensome for a multi
21 billion dollar company like that.  Unless Your Honor has any
22 questions, I'll yield the podium.

23        THE COURT:  No, I have none.  Let me hear from St.
24 Jude.

25        MS. BIALZIK:  Good morning, Your Honor.  Your Honor,

St.JudeReplyApp'x.010

1  we agree that preference cases are typically settled without

2  the need for a trial because parties can evaluate the

3  information and determine whether there are valid defenses.

4  The same is true of a 503(b)(9) case, and in both cases here

5  where we have a 503(b)(9) case that is based on claims of

6  product delivered within the 20-day period and a preference

7  action where the defense is a new value defense, and new value

8  again is based on product that is delivered within the 90-day

9  period that has the value, those are both very straightforward,

10 very routine claims and defenses that can be evaluated off of

11 invoices and proof of delivery.

12      And, Your Honor, St. Jude has provided invoices,

13 proof of delivery, packing slips.  Now, we understand that

14 there may be something that the trustee finds confusing on an

15 invoice.  For example, he's incorrect in stating that there's a

16 date of delivery that's after the date of the procedure, but

17 there is on the invoice what appears to be a ship date after

18 the date of delivery.  We understand how that might be

19 confusing.  A targeted interrogatory request could have

20 resolved that because, as we put in the declaration of Richard

21 Genovese, there is an explanation for that, and also Gregory

22 Howett (phonetic).  The explanation for that is it's simply a

23 computer function.

24      What happens here in these cases, as Genovese

25 explained, when you have a hand carry delivery, meaning, as Mr.

St.JudeReplyApp'x.011

1  Rukavina indicated, that a sales agent is on site at the

2  hospital, usually in the delivery room, and he delivers product

3  to Walnut Hill during the procedure, that is the implant date,

4  that is the delivery date, that is the date of service.  That

5  is consistent on all documents we provided.

6        Then the sales agent goes and he enters information

7  into his computer system, and at some shortly thereafter date

8  his computer system uploads information into the St. Jude

9  billing system.  The ship date reflects simply the date that

10 the information is transferred from one computer system to

11 another.

12       Now, again, had we had targeted discovery on that

13 kind of a question, we could have produced declarations, which

14 we have now put in the record, and we have offered from the

15 very beginning to provide Mr. Genovese himself and Mr. Howett,

16 if the trustee would like to come to Illinois, to sit for a

17 deposition to explain the procedures, to explain that there was

18 no consignment relationship.  There simply is no evidence

19 anywhere of a consignment relationship.  Yes, the agreement

20 provided that one could have been set up, but there's no

21 evidence it was set up.  We have testimony confirming it was

22 never set up.

23       All of the documentation indicate a delivery date

24 that precedes the date of invoice, and, again, Mr. Genovese is

25 available.  And as the Federal Rules of Civil Procedure

St.JudeReplyApp'x.012

1  explicitly state in 26(b)(2), if there's a less burdensome

2  method for a party to obtain the information it needs, that's

3  what should be pursued.

4       Now, we don't even understand exactly what it is that

5  the trustee thinks that St. Jude should be looking for.  St.

6  Jude has produced all of the records that is has from the

7  places that it knows those records are likely to exist, its

8  computer systems that have billing records and invoice records.

9  It has not searched through archived e-mails to see if there

10  might be some random communication that references Walnut Hill

11  because there's no reason to do that.  We have all the

12  information we need.  It's burdensome.  It's expensive.  The

13  trustee has acknowledged searching archived records is

14  expensive.

15       And the trustee has what it needs.  The trustee could

16  ask Mr. Genovese to sit for a deposition.  Certainly if

17  something came up there that, again, a narrow, targeted reason

18  for some additional discovery requests, that would be

19  appropriate, but this broad fishing expedition is not.

20       And let me be clear, St. Jude is not hiding behind

21  any boilerplate objections.  We have been explicit in phone

22  conversations and in writing that there are no documents that

23  are -- or information that is being withheld based on

24  boilerplate objections.  We told the trustee he could deem our

25  responses amended to reflect that, if that's important to him,

St.JudeReplyApp'x.013

1  but we are relying solely on specific objections that we've

2  been willing to discuss with the trustee from the beginning.

3         And, again, we've said, take Mr. Genovese's

4  deposition, get the information you need.  This is

5  straightforward, and we believe that whatever questions he has

6  about the way these invoices look could be answered in a much

7  less burdensome and difficult manner.

8         THE COURT:  All right.  Trustee, response, anything?

9         MR. RUKAVINA:  Yes, Your Honor.  I think counsel's

10  arguments prove exactly why discovery is appropriate here.  She

11  says that there's a consignment contract, but the parties never

12  had a consignment agreement.  She says that there's apparently

13  mistakes with the computer programs that print wrong dates on

14  invoice dates.  This is why communications regarding these

15  matters are critical, so we can test, Your Honor, what counsel

16  says, so we can test what Mr. Genovese says.  Of course we will

17  depose Mr. Genovese, but we should not be required to depose

18  him before we see his own governing contracts and his own

19  communications.

20         All you have to look at, Your Honor, is Exhibit J in

21  our appendix.  This gentleman was implanted with a pacemaker

22  and that Exhibit J expressly says that the date of implant was

23  May 24th, the corresponding invoice says ship date May 31st,

24  invoice date June 12th.

25         Your Honor, with respect to them saying that they're

St.JudeReplyApp'x.014

1 withdrawing their general objections or boilerplate objections,

2 that's not what they says in Exhibit G. In Exhibit G in a

3 letter, in a letter, not in a formal response, they say that to

4 the extent you deem our objections and responses revised,

5 accordingly, you can deem them revised by this debtor. Well,

6 Your Honor, serve a clean response to discovery that omits the

7 general and boilerplate objections.

8         And, Your Honor, this is not a fishing expedition.

9 These are targeted discovery requests. We're happy to discuss

10 further narrowings of them, if required, once they get past

11 their general objections. These are not discovery requests

12 that say any and all communications going back years. These

13 are targeted requests for Mr. Genovese's communications and

14 contracts, the other sale person's communications and

15 contracts, and communications going back and forth with the

16 debtor. That's targeted, Your Honor. Thank you.

17         THE COURT: All right. I know you -- all counsel

18 know that judges love discovery disputes. We stay up at night

19 hoping that discovery disputes come in, as I did last night.

20         First of all, the trustee I think pointed this out,

21 but for the benefit of everybody, including the trustee, this

22 is not a hearing on a motion for summary judgment. I am not

23 deciding whether there was, whether there was not a

24 consignment. However, there are enough papers in there that

25 suggest that that is an area of relevance to the inquiry.

St.JudeReplyApp'x.015

1    And we're not talking about $75,000 that somebody

2 paid to an auto parts place in the 90 days before bankruptcy.

3 This is big money on both sides.  So I think it justifies a

4 little extra time and attention.

5    Having said that, I would tell the trustee's counsel

6 that, you know, not everybody settles.  You know, if everybody

7 settled, you wouldn't need me and the other people who, you

8 know, get these really nice robes.  So the fact that St. Jude

9 is not rolling over is -- that's really of no import, and I am

10 not viewing anybody's position in this as purely belligerent

11 for the sake of being belligerent.

12    So with those comments in mind, here's the first

13 thing I want to do, I want to go through the general

14 objections.  The trustee has got the better of this, but not

15 entirely.  I won't tell you what I penciled in the margin of

16 my copy of the general response, which was attached to the

17 trustee's appendix, and I'm specifically looking at Document

18 10, which purports to be St. Jude's combined preliminary

19 responses, Exhibit D to the trustee's -- in the trustee's

20 appendix.

21    This puts me in mind of an old railroad lawyers, what

22 we call here general denial, you know, with a -- and the first

23 year associate who simply goes to the Federal Rules and ticks

24 off every single affirmative defense and says, you know, maybe

25 it'll apply, maybe it won't, but what can it hurt to throw it

St.JudeReplyApp'x.016

1 | in.

2 |       So you all know how this works.  So we're going to go

3 | through this, and the big picture here is that St. Jude is

4 | going to have to amend its responses, both with respect to

5 | these general objections to make it absolutely clear what's

6 | been produced and what is not being produced, and if there is a

7 | claim of privilege, St. Jude is going to have to make that

8 | claim unambiguously and it's going to have to provide a

9 | privilege log to the trustee within a time that we can talk

10 | about.  All right.

11 |       So the general responses objects to the extent they

12 | impose any objection, this is Number 1, greater or inconsistent

13 | with the Federal Rules of Bankruptcy Procedures and the Federal

14 | Rules of Civil Procedure.  You know, that's an objection that

15 | is just overbroad.  You can make that objection -- make an

16 | objection, if that's an objection, in each response, so that's

17 | got to come out.

18 |       Number 2, you generally object to the extent that the

19 | requests are overbroad, not sufficiently particularized.

20 | That's humbug too.  You make that objection and response to

21 | each discovery request, not a blanket objection.  Once again

22 | that's to eliminate any doubt about what is being produced or

23 | what is being answered and what is not being answered.

24 |       Number 3, objection to the extent that they request

25 | disclosure of confidential and proprietary information.  That

St.JudeReplyApp'x.017

1 can be raised in response to each discovery request, no blanket

2 objections.

3        Number 4, the same sort of objection, but this is

4 directed to attorney/client privilege and the work product

5 doctrine, the same thing, you have to urge that a response to

6 each discovery request.

7        I'm not really sure what Number 5 is, but generally

8 discovery is not directed to post-lawsuit communications among

9 the lawyer and the clients.  Those are -- I think the trustee

10 conceded that in his filings, but I don't know why that's

11 necessary to include it, but I don't think it's necessarily

12 appropriate.

13        But I move to six now, it's a general objection on

14 the basis of whether it's discoverable under Rule 26.  You just

15 have to make that in connection with each discovery request

16 rather than a blanket objection.

17        Number 7, objection to the request that -- the

18 request seek documents already in the possession of the debtor

19 or the trustee.  Well, that's an inappropriate objection

20 because it's perfectly permissible to ask for copies of

21 documents.  There may be non-identical copies of documents, and

22 the fact that the trustee or the debtor may already have them

23 it does not necessarily eliminate the probative value of St.

24 Jude's possession of the documents in production of them.

25        The objections to the definitions that instructions

St.JudeReplyApp'x.018

1  related -- you know, that's just something you have to make in

2  response to each individual discovery request, although St.

3  Jude is -- rather the trustee has taken a page out of every

4  pattern or discovery request for the past 40 years.  Every year

5  they become a little bit more onerous.  With the advent of

6  electronic information it became pluperfectly, prismatically

7  onerous.

8          So, all right, now let's go to the -- well, actually

9  Number 10, discovery is continuing, I don't know that you need

10  to include that, and -- because the rules impose a continuing

11  obligation to make discovery.

12          And Number 11 is where you -- where St. Jude sort of

13  creates the problems for itself, but it goes without saying, if

14  the general objections are problematic, then incorporating them

15  into the individual response is even more problematic.

16          So all right, Interrogatory 1, and all these

17  interrogatories and requests for production commence with the

18  phrase subject to the general response.

19          MR. RUKAVINA:  Your Honor, we -- not to interrupt the

20  Court, but --

21          THE COURT:  Yes.

22          MR. RUKAVINA:  -- counsel and I agreed that we don't

23  have a problem with the interrogatories thus far, so certainly

24  if Your Honor wants to comment on them, but --

25          THE COURT:  Okay.  No, no, let's go -- let's -- I was

St.JudeReplyApp'x.019

1  going to say about the interrogatories it's simply the lead in
2  to all of them.  It's incorporating general responses.
3          All right.  The first set of production, all
4  communications between St. Jude and the debtor that relate to
5  or evidence an agreement to provide goods to the debtor,
6  including documents or communications by which the debtor
7  agreed to same.  Okay.  St. Jude's objection is that it's
8  overbroad and that it's non-proportional to the needs of the
9  case.  Trustee, I -- you contend that that's not appropriate,
10  correct, and that, in fact, it's not overbroad, right?
11          MR. RUKAVINA:  Correct, Your Honor.
12          THE COURT:  All right.  What does St. Jude say?
13          MS. BIALZIK:  Your Honor, the term relate to is
14  extremely broad, and any communication that relates to any
15  agreement would cover a myriad of things that are tangential
16  and extraneous.  We have provided all of the actual agreements
17  that we have in NOA.  We provided the invoice records.  I don't
18  know what we would even be searching for if we were to look
19  through archived e-mail records for any reference to Walnut
20  Hill that could be considered relating to their agreement to
21  provide goods.  Their entire relationship was an agreement to
22  provide goods.
23          MR. RUKAVINA:  Well, but as the --
24          THE COURT:  Well, you know, you urge the ordinary
25  course of business actually -- well, you originally urged, and

St.JudeReplyApp'x.020

1 I think your answer that the ordinary course of business was an

2 affirmative defense. Now, I understand there's correspondence

3 in which you may have abandoned that, but your 50 -- your

4 priority claim under 507 and 503 that includes a component of

5 ordinary course of business.

6 So why does that not still keep the communications

7 between St. Jude and Walnut Hill relevant and discoverable

8 within the meaning of Rule 26?

9 MS. BIALZIK: Well, Your Honor, the 503(b) ordinary

10 course of business is a different ordinary course of business.

11 The ordinary course of business where it's a defense to a

12 preference claim is looking at ordinary course for payment

13 purposes. And we are not relying on that and if the we need --

14 if the Court needs us to formally withdraw it we can because we

15 have a complete new value defense.

16 In terms of the 20 days, I mean, the evidence is

17 clear that the parties were ordering goods, their medical

18 supplies for the business of the debtor. There's nothing in

19 there to suggest that this is not part of the debtor's ordinary

20 course of business here. And so what are we searching for,

21 Your Honor?

22 There's, you know, records that goods were ordered

23 and delivered and I'm not even sure what possibly could exist

24 in some random file or e-mail communication here that relates

25 to this agreement but we've provided enough to show that the

St.JudeReplyApp'x.021

1 goods were delivered pursuant to being ordered by a medical

2 facility and their medical products.

3          MR. RUKAVINA:  Well --

4          THE COURT:  The Trustee has said that there was a --

5 the business was winding down by the time -- by the time we

6 were 20 days pre-petition.  I think that's what I understood

7 the Trustee to say.  Is that correct?

8          MR. RUKAVINA:  That's part of what we're saying, Your

9 Honor.  And just to refresh the Court's memory, there is

10 evidence of a consignment.  St. Judge is saying there was no

11 consignment.  So I submit that there's an ambiguity here and

12 the communications leading up to whatever agreements there were

13 or whatever communications might have modified those agreements

14 is absolutely relevant.  Because let's not forget that for a

15 503(b)(9) it's got to be 20 days.  So, what date did title

16 transfer to any goods that may or may not have been shipped?

17 What date were goods ordered when the Hospital ceased

18 operating?

19          THE COURT:  What other documents are there to

20 produce?

21          MR. RUKAVINA:  And, Your Honor, there may not be but

22 I suspect given what we've seen so far in other cases that

23 there's going to be -- whoever is the accounting person at St.

24 Judge, and we don't know who that is, there's going to be

25 communications putting the debtor on a credit hold, maybe

St.JudeReplyApp'x.022

1  changing the terms of the consignment agreement.  There may be,
2  I don't know if there is, negotiations by e-mail leading up to
3  the consignment agreement.  There may be communications with
4  the salesman saying hey, we don't have the money to pay for
5  this.  Can we pay you for this old invoice or something.

6       I don't know but I don't think it's going to take St.
7  Jude but a little bit of attorney time to go target certain
8  people's e-mails and run certain word searches like Walnut Hill
9  or Like Rick Leonard (phonetic) or something like that.  And if
10 there's nothing that they can tell us that after a reasonable
11 search they found nothing, no problem.

12      THE COURT:  These are all -- St Jude, are these all
13 on electronically accessible database?

14      MS. RUKAVINA:  They are archived because St. Jude had
15 a process of expunging e-mails within 30 days.  We're not even
16 sure what exactly is in the archives but we know that it is
17 expensive and onerous for us to go and do that search.  And the
18 point is that we've offered, again, we've offered testimony
19 from the sales agent who was there who can confirm whether or
20 not -- it's a simple question -- either there was consignment
21 inventory or there wasn't.  And if he can provide the
22 testimony, an oral testimony that is consistent with the
23 documents, why should St. Jude have to go through the burden of
24 trying to get an IT specialist to come in to figure out what's
25 on the archive.

St.JudeReplyApp'x.023

22

1          The Trustee, in his own papers, has admitted he's

2    not searching the debtor's records which he has archived.  He

3    could look for these same e-mails between the parties talking

4    about the lack of a consignment relationship in the debtor's

5    records and he doesn't want to do it because it's expensive.

6    The same is true for St. Jude and there's no reason for it

7    because we have plenty of evidence and other less burdensome

8    ways for the trustee to ask his questions directly from the

9    sales agent who was responsible.

10          MR. RUKAVINA:  Might I reply, Your Honor?

11          THE COURT:  Yes.

12          MR. RUKAVINA:  Your Honor, the problem with St.

13    Judge's position is that it is their burden evidentially to

14    prove what counsel just said.  And they have not proven

15    whatever burden she alleges there may be.  Now, I represent my

16    law firm all the time.  And de-archiving e-mails is as simple

17    as me sending an e-mail to my IT people saying crack open this

18    archived e-mail.  It's -- we're not talking about e-mails that

19    are ten years old that are stored off site.  We're talking

20    about a very simple process of de-archiving and, literally,

21    it's the press of a button.  And the reason why we haven't

22    searched all of the debtor's communications is because we don't

23    know where to search.

24          So, it's not true what counsel said that we're just

25    flat refusing to.  We have searched, for example, Rick

St.JudeReplyApp'x.024

1  Leonard's e-mail communications.  It's not hard because we know

2  that he's the purchasing manager.  But we have something like

3  315 employees.  So, for us to go through the 350, because we

4  don't know, we're not the debtor, that is a much, much, much

5  greater burden than for St. Jude to send an e-mail to five or

6  ten employees saying, hey, do you have any communications with

7  the debtor going back -- remember the Hospital was only open

8  for two and a half years.  We're not talking about 15 years of

9  communication.

10        THE COURT:  All right, now --

11        MS. BIALZIK:  Your Honor --

12        MR. RUKAVINA:  We are administratively --

13        MS. BIALZIK:  Your Honor, employees wouldn't have

14  access to their e-mails.  I just said, those e-mails are purged

15  after 30 days so it is an onerous deal of going and getting an

16  IT specialist to go in and look at archived files.  I don't

17  even know where those archived -- I don't know where he's

18  getting information about what this process would be but it's

19  not as simple as asking employees to check their own e-mails

20  because those employees don't have access to their own e-mails.

21        MR. RUKAVINA:  Your Honor --

22        THE COURT:  Right.  But I'm -- okay, let me see if I

23  can save everyone's breath.  I'm overruling the objection and

24  I'm going to give St. Jude 14 days to produce the other

25  documents.  If I need to be specific, it's archived e-mails and

St.JudeReplyApp'x.025

1  if 14 days is unreasonable, I'm amenable to extending that time

2  by motion and I would expect counsel to cooperate on that.  But

3  we're not talking about e-mails from the dawn of the e-mail

4  era.  We're talking about e-mails 14 months ago.  That's not

5  terrible long -- 15, 16 months ago.

6         So, all right, Request Number 2, all documents and

7  communications within one year before the petition, that

8  details shipments of goods from St. Jude to the debtor

9  identifying the goods shipped, prices, date of shipping and the

10  date the debtor ordered the goods.  Once again the objection

11  that it is overbroad, it is not proportional to the needs of

12  the case it's subject to those general objections and in that

13  objection there were documents produced in response to the

14  first interrogatory.  I would suggest that -- well, let me hear

15  the argument.

16         MR. RUKAVINA:  Your Honor, the argument is the same

17  for Number 3 -- Request Number 2 and Number 3.  I think that

18  St. Jude has produced everything that's responsive so if that's

19  the case then all they have to do is withdraw these general

20  objections and say hey, we produced what's responsive.  If they

21  have not produced what's responsive, then I have further

22  argument.

23         THE COURT:  St. Jude?

24         MS. BIALZIK:  St. Jude has produced everything that

25  we're aware of that's responsive.

St.JudeReplyApp'x.026

 1          THE COURT:  All right.

 2          MR. RUKAVINA:  Other than communications, of course.

 3          MS. BIALZIK:  Other than communications.

 4          THE COURT:  Right and then --

 5          MS. BIALZIK:  Yeah, and that's what -- in addition

 6   was the communications because, again, we felt like that was

 7   overly broad but --

 8          THE COURT:  Right.  All right.  Well, you've made

 9   that argument and I've ruled.

10          Okay.  As to Request 2 and 3, the ruling is to amend

11   the Request to any responses to delete the objections within 14

12   days.

13          All right, Request 4 is communications related to any

14   assertion in the motion, which I assume is a 503(b) motion,

15   including all documents and communications that St. Jude will

16   offer into evidence on any hearing on the motions.  Let me say

17   this to start, I'm not going to direct St. Jude to identify

18   what it's going to use.  I think that impinges on the work

19   product of the attorney.  So, you can't get it that way.  It's

20   easy to take a piggy-back ride on imposing counsel.  I'm not

21   going to make him do that but production of documents relating

22   to facts or assertions in the motion and the objection is, once

23   again, overbroad and not proportional.  And, well, I'll let St.

24   Jude respond.

25          MS. BIALZIK:  Well, again, it -- the issue is that

St.JudeReplyApp'x.027

WWW.JJCOURT.COM

1  this communications idea that we were going to have to go

2  search through archived e-mails or anything that might have a

3  reference to something seemed to us overly broad. We've, you

4  know, we've produced the evidence that we have that we intent

5  to rely on. We've offered up the actual people on the ground

6  for deposition and we felt that it was overly broad for us to

7  have to be going and searching through archived e-mails that

8  may or may not even exist at this point.

9       THE COURT: Trustee, anything to add?

10      MR. RUKAVINA: No. I think Your Honor has ruled on

11 that and I hear you loud and clear about getting a sneak peek

12 of their evidence. I hear you on that, Your Honor.

13      THE COURT: Okay. On having said that again, Mr.

14 Rukavina, I'm hearing some difficulty with the signal with

15 hearing what came through.

16      MR. RUKAVINA: I'm sorry, Your Honor. Can you hear

17 me now?

18      THE COURT: Yes, I can.

19      MR. RUKAVINA: What I was saying, Your Honor, was

20 that I think you've already ruled on the communications part of

21 that.

22      THE COURT: Yes.

23      MR. RUKAVINA: And I hear you on the evidence and I

24 understand that you're not going to grant that and that's just

25 fine.

St.JudeReplyApp'x.028

1          THE COURT:  Right.  So, I think St. Jude needs to

2     amend its response within 14 days to delete the objections.  I

3     agree that it need only comply with the scheduling order for

4     production of the exhibits it intends to introduce and I don't

5     think I need to make any further ruling on that.

6          Number 5, communications between St. Jude and third-

7     parties related to any demand for payment, claims submitted or

8     payment received by St. Jude against or from such third-party

9     on account of the debtor's failure to pay.  St. Jude said

10    there's no documents.

11         Trustee?

12         MR. RUKAVINA:  If they delete the general objections,

13    then we're happy with their response that there's no documents.

14         THE COURT:  St Jude?

15         MS. BIALZIK:  All right.  We've already stated in

16    writing that we are not withholding anything.  Based on general

17    objections I think we have effectively already done that.  So,

18    I don't think that there's anything that we're fighting about

19    here.

20         THE COURT:  Okay.  So, amend the response within 14

21    days to delete the subject to the general response.  All right.

22    Number 6, documents and communications that support your

23    answers to the interrogatories not otherwise requested in

24    another request.  I don't know that I need to rule on this

25    other than to direct St Jude to amend its response to delete

St.JudeReplyApp'x.029

1  the general objections or the objections within 14 days.  Does

2  that make sense to you both?

3            MR. RUKAVINA:  It does to me, Your Honor.

4            MS. BIALZIK:  Yes, Your Honor.

5            THE COURT:  St Jude?

6            MS. BIALZIK:  Yes, Your Honor.

7            THE COURT:  All right.  Good.  Number 7, different

8  pricing charged different customers.  Trustee, why is this

9  relevant to anything?

10           MR. RUKAVINA:  Well, Your Honor, we did in our

11 response admit that this was a little overbroad and perhaps

12 premature.  It is relevant to the question of value for

13 503(b)(9).  As Your Honor will hear later, we have something

14 like two hundred, three hundred thousand dollars of heart

15 valves that in the last year we have not been able to sell.

16 We're looking to donate them to a hospital in India.

17           Now, this may be premature but let's assume -- and I

18 have no evidence of this -- let's assume that St. Jude sells us

19 a heart valve for $20,000 but Baylor, Scott and Wolfe for

20 $10,000?  That would be relevant.  But, again, I concede that

21 this is overly broad and I think that the Court should instruct

22 me to discuss this with opposing counsel within reason once the

23 general and boilerplate objections are removed so we can have a

24 meaningful discussion about this.

25           THE COURT:  St. Jude?

St.JudeReplyApp'x.030

1          MS. BIALZIK:  Your Honor, we adamantly feel that this

2    is overbroad and is seeking confidential, irrelevant

3    proprietary information.  There is no case law that the Trustee

4    has pointed us to.  We've invited him to find us any case law

5    that would support his idea that pricing that St. Jude may have

6    had with other customers could be relevant to the question of

7    value.  There is case law that we have cited.  The Semcrude

8    case clearly states that the invoice price is the presumptive

9    identification of the value.  He's provided no authority that

10   would suggest that it would be different.

11          And this -- these 503(b)(9) cases, Your Honor, are

12   filed every day.  And every day they are for goods sold.  And

13   if there was some authority that backed the inquiry should be

14   looking at the seller's pricing to other customers negotiated

15   likely on an individual basis to other customers, is relevant

16   or something that the Court should be looking into, there would

17   be case law supporting that.

18          THE COURT:  All right.

19          MS. BIALZIK:  So, I just think this is --

20          THE COURT:  Trustee, final response?

21          MR. RUKAVINA:  The Semcrude case, Your Honor, says

22   that the price charges of presumptive, pardon me, is the

23   presumptive price which can be overcome by the Trustee.  But,

24   again, I can see that as written this is too broad.  And I'd be

25   happy to --

St.JudeReplyApp'x.031

1          THE COURT:  Right.  I'm going to sustain the St.

2   Jude's objection to this.  I don't think you're entitled to get

3   into St. Jude's pricing or its relationship with third-parties.

4   I think that is classic proprietary information.  And let's

5   move now to the second set of requests for production.

6          Number 1 is -- I'm paraphrasing here --

7   communications between St. Jude and Richard Genovese including

8   Richard Genovese, Jr., mentioning Walnut Hill, including

9   invoices and other documents.  And the response is overbroad,

10  not proportional to the needs of the case.

11         Trustee?

12         MR. RUKAVINA:  Your Honor, request 1 through 8 are

13  substantially the same.  These are people we believe, from the

14  invoices, that were salesman or people who delivered the

15  physical goods.  And primarily the issues here relate to

16  communications, which I think Your Honor has already ruled on.

17  Also we are requesting any contracts that St. Jude might have

18  with these salesmen.

19         Now, St. Jude says that these are employees so there

20  may very well not be any contracts buying if that's the

21  response.  But if they are third-party sales people, then

22  whether they have any contracts is relevant.  For example, when

23  and how and under what circumstances did they release a heart

24  valve to the debtor?

25         So, all of these 1 through 8 just go to what we've

St.JudeReplyApp'x.032

1  already discussed, which is what was the actual practice on the

2  ground, consignment or not, with respect to how and when the

3  debtor ordered a part and how and when St. Jude provided that

4  part and how and when the debtor was to pay for that part.

5         THE COURT:  All right.  Well, this is broader than

6  contracts.

7         St. Jude?

8         MS. BIALZIK:  Yeah.  Your Honor, our issue with this

9  was not simply the burden of searching archived e-mails.  It's

10  also that it's extremely broad.  It's talking about any

11  communications that relate to or mention the debtor.  This

12  would include everything that he might have about his sales

13  territories, his compensation.  And he may well have employment

14  agreements that talk about his own compensation or benefits or

15  how he has a sales strategy.

16         I don't see how any of this has to do -- particularly

17  with this limited question of whether there was a consignment

18  inventory.  We can look for some e-mail communications -- we've

19  already said we're going to do that -- but beyond that, if it's

20  not an e-mail communication that's directly talking about

21  something relating to this consignment theory, I don't see how

22  this has any relevance, particularly because they can take his

23  deposition.

24         And I'd also like to point out that these are -- 1

25  through 8 -- essentially the same request but only this first

St.JudeReplyApp'x.033

1   one, Richard Genovese, goes to a sales agent who was involved

2   in the Hand Carry (phonetic) business. The rest are sales

3   agents who happened to be mentioned on FedEx. And my

4   understanding is there's no suggestion that FedEx inventory

5   could have been consignment. It's clearly delivered by FedEx.

6   So, after Mr. Genovese there's no reason that any of these

7   sales agents have any relevance to anything.

8           MR. RUKAVIN: But, Your Honor --

9           THE COURT: But the fact that it's FedEx doesn't

10  preclude a consignment arrangement, I think. You could FedEx

11  something in the hospital and they can put it on the shelf in

12  the supply room, they keep it for the next procedure. But --

13          MS. BIALZIK: But they bill for it, Your Honor.

14          THE COURT: -- be that as it may --

15          MS. BIALZIK: But they bill for it immediately. So

16  then it's not a consignment because it's paid for immediately,

17  which means it's not something where it's sent by FedEx and

18  held until some later date. It's billed for contemporaneously

19  with FedEx. So there's no way that that could be part of some

20  sort of consignment inventory.

21         MR. RUKAVINA: Your Honor, this is part of what we

22  attempted to discuss during our discovery conference dispute

23  call. What the Trustee wants, only, are communications that

24  mention the debtor and only any contracts that govern Mr.

25  Genovese's or these other salesmen's deliveries and releases.

St.JudeReplyApp'x.034

1  We don't want employment files.  We don't want disciplinary

2  files.  We don't want tax files.  We don't care about other

3  hospitals.

4          So, what we want are communications that mention the

5  debtor, which I think Your Honor has covered and then

6  contracts, if any, and there may very well not be that -- where

7  St. Jude tells Mr. Genovese or these other people, okay, here

8  is when, how and why you release a particular good to the

9  debtor.

10         THE COURT:  All right.  Let me see if I can parse

11 this.  You're satisfied with my order with regard to

12 communications that that is broad enough to cover

13 communications that these employees concerning Walnut Hill,

14 correct?

15         MR. RUKAVINA:  Absolutely, Your Honor.  Yes.

16         THE COURT:  All right.  Now, let's go to employment

17 contracts.  St. Jude, do these contracts, assuming there are

18 contracts, I happen to know not with St. Jude but other medical

19 supply businesses, that there are, if there -- even if there's

20 an employee relationship, there is a contract governing that

21 relationship.  Do those contracts with St. Jude  address

22 delivery of product to hospitals in any way that would touch on

23 any of the issues here?

24         MS. BIALZIK:  Your Honor, we asked St. Jude and they

25 indicated that they don't have some sort of global employment

St.JudeReplyApp'x.035

34

1  contract that would touch on this.  What they might have are

2  agreements regarding compensation or benefits.  But the don't

3  have a contract with these sales agents that governs the manner

4  in which they perform their job and is what we've been told by

5  St. Jude.

6       MR. RUKAVINA:  And, Your Honor, we would take that as

7  a response to this discovery request if that is, in fact, the

8  case.  No problem.

9       THE COURT:  All right.  So, let's do this.  To

10 eliminate any ambiguity, and I know you know that if some

11 document turns up later one, it's not going to reflect well on

12 the parties, so, you can amend your responses to Request 1

13 through N, I guess "N" being 9, the second set of requests for

14 production to remove the general objections and the others

15 directed to breadth of discovery and the burdensome nature of

16 the discovery to specify that there are no contracts, right?

17 And I think my ruling on communications in the first set of

18 requests addresses everything else.  So, if we have to tweak

19 these responses to reflect that, I think that covers it.

20      Now, what are we left now?

21      MR. RUKAVINA:  I think we're left with Number 9.

22 Your Honor just ruled on Number 9 -- I don't know if you

23 intended to or not.  Number 9 is really cumulative of

24 everything else we've discussed today.

25      THE COURT:  Oh.  Yes.  I'm sorry.  I thought Number 9

St.JudeReplyApp'x.036

**WWW.JJCOURT.COM**

35

1  was in light of our argument -- Number 9 was yet another

2  employee.

3          MR. RUKAVINA:  It's just --

4          THE COURT:  Okay.

5          MR. RUKAVINA:  -- cumulative of everything else.  So

6  I think if the Court has ruled on communications and I think if

7  St. Jude responds that there are no contracts other than been

8  produced, then I think we're fine.

9          THE COURT:  Right.  I think Request Number 9 is

10  cumulative so I'm going to sustain St. Jude's objection to

11  request Number 9 as cumulative.

12         Is that explicit enough for everyone?

13         MR. RUKAVINA:  It is for the Trustee, Your Honor.

14  The last thing we had was we have requested reasonable

15  attorney's fees.

16         THE COURT:  Right.  I'm not going to award attorney's

17  fees.  I think that St. Jude made it's objections in good faith

18  and both of you are coming before a new judge for the first

19  time.  So, I think this is -- passionate advocacy is a good

20  thing.  I think that maybe we got a little bit out of hand on

21  this.  I don't think that -- I think there's more heat than

22  light generated in this dispute.  All right?  Let me put it

23  that way for the scientists among you.

24         So, I'm not going to award attorney's fees but I

25  would prefer not to see a motion like this again.  So please

St.JudeReplyApp'x.037

1   try to resolve them.  I'm available if we have to have

2   discovery disputes adjudicated but it's not in the client's

3   best interest, okay?

4         MR. RUKAVINA:  And, Your Honor, are we to propose an

5   order or is the Court going to prepare one?

6         THE COURT:  Please propose an order.  Collaborate.

7   Agree on the terms of the order.  If you have any questions,

8   call chambers speak to the law clerks and they'll bring it to

9   me.  All right?

10         MR. RUKAVIN:  Thank you, Your Honor.

11         MS. BIALZIK:  Your Honor, we have one more matter

12   here because obviously we're going to be undertaking some

13   additional discovery responses here.  And as far as I could

14   tell, there was nothing in the scheduling order in this case

15   that had a mandatory mediation.  We believe this would be an

16   appropriate case for such a mediation and so we're wondering if

17   the Court would consider -- which may require us altering the

18   current scheduling order set out.  For example, the summary

19   judgment deadline so that we could get a mediation done.  Once

20   we get this discovery done we feel this is a case that would be

21   appropriate for that.

22         MR. RUKAVINA:  Well, Your Honor --

23         THE COURT:  Trustee?

24         MR. RUKAVINA:  We are going to have to amend the

25   scheduling order because we're supposed to go to trial in

St.JudeReplyApp'x.038

1 September. I don't think there's any way we're going to be
2 ready for a trial September, given the four month delay on
3 discovery. The Trustee is against mandatory mediation. I
4 think the practice in this district is that the judges do not
5 order it. But that being said, the Trustee will always
6 reasonably consider a mediation proposal when and if he thinks
7 that he's ready to sit down and have a meaningful discussion.
8        THE COURT: St. Jude, let me suggest this. Why don't
9 you all take a look at whatever else is coming out through the
10 production as a result of today's hearing. If anything, my
11 personal practice is that I do not order mediation unless all
12 the players agree to mediation. I think, other than that, it's
13 -- we're forcing people to do something that they really have
14 no obligation to do when they have a judge who can decide a
15 case for them. But after the Trustee reviews whatever else
16 comes out, if cooler heads prevail, if the parties want to
17 mediate, I'm amenable to further adjustment of the trial
18 schedule to allow that to go forward if it would save everybody
19 money.
20        But in the meantime, what I would encourage you all
21 to do is to discuss reasonable settlement of any of these
22 issues. You know, I'm not afraid to try it. Judge Houser is
23 going to be around -- she's not afraid to try these things.
24 But the worst settlement is better than the best lawsuit. And
25 you can put that on my tombstone. Share that with your

St.JudeReplyApp'x.039

1  colleagues, you know?  They'll disagree but, you know, that's

2  what -- that's where you get the money to build stadiums at law

3  schools and -- anyway.

4          Okay.  Anything else lady, gentlemen?

5          MS. BIALZIK:  One more thing, Your Honor.

6          THE COURT:  Yes?

7          MS. BIALZIK:  We absolutely understand that but as

8  Mr. Rukavina just mentioned, with this additional discovery, I

9  think we may have to set some new dates in the scheduling order

10 and we're all here.  I mean, I -- certainly if the Court

11 doesn't want to do that right now but it just seems to me we're

12 all in the courtroom should we figure out some new dates?

13         MR. RUKAVINA:  Well, I think we should get the

14 courtroom deputy and propose their own scheduling order, Judge.

15         MS. BIALZIK:  That's a good idea.

16         THE COURT:  That's what my suggestion is, as well.

17         MS. BIALZIK:  Okay.

18         THE COURT:  I don't have your scheduling order in

19 front of me.  I didn't tinker with the original scheduling

20 order.  I'll be happy to get involved if you can't reach an

21 agreement.  But if you would speak to Ms. Harden the courtroom

22 deputy you can come up with a schedule.  She'll call me and ask

23 me for my input if it's necessary and -- but I think it's a

24 good suggestion.  Do it while you're there if you can get her.

25 She's downstairs, I think.  If she could accommodate you.  This

St.JudeReplyApp'x.040

1    would be a good time to do it while you're all in the building.

2    All right?

3            MS. BIALZIK:  Right.  Thank you, Your Honor.

4            MR. RUKAVINA:  Thank you, Your Honor.

5            THE COURT:  Thanks, folks.

6                    * * * * *

7            **C E R T I F I C A T I O N**

8            We, COLETTE MEHESKI and ALYCE H. STINE, court

9    approved transcribers, certify that the foregoing is a

10   correct transcript from the official electronic sound

11   recording of the proceedings in the above-entitled matter,

12   and to the best of our ability.

13

14   /s/ Colette Meheski

15   COLETTE MEHESKI

16

17   /s/ Alyce H. Stine

18   ALYCE H. STINE

19   J&J COURT TRANSCRIBERS, INC.        DATE: June 22, 2018

20

21

22

23

24

25

St.JudeReplyApp'x.041



Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7528
jvasek@munsch.com

July 10, 2018

Exhibit "C"

***Via Electronic Mail***
Samuel C. Wisotzkey
Kohner, Mann & Kailas, S.C.
4650 N. Port Washington Rd.
Washington Bldg., 2nd Floor
Milwaukee, WI 53212-1059
swisotzkey@kmksc.com

Re:     *Seidel v. St. Jude Medical S.C., Inc. (In re Walnut Hill Physicians' Hospital, LLC)*, Adv.
No. 18-3033, pending in the U.S. Bankruptcy Court for the Northern District of Texas

Dear Mr. Wisotzkey:

On June 27, 2018, the Court ordered St. Jude to produce archived emails responsive to fourteen requests for production by no later than July 5, 2018. After a brief, agreed extension, St. Jude produced responsive documents on July 9, 2018. We were surprised that St. Jude's production consisted of only sixteen pages of emails. Based on our correspondence related to the agreed extension, it appears that St. Jude is taking the position that there are no more responsive documents. While we intend to give St. Jude the benefit of the doubt, St. Jude clearly has not produced all responsive emails.

First RFP #2, for example, requests "[a]ll … Communications between the Debtor and St. Jude within the one (1) year prior to the Petition Date …." As we explained to St. Jude and to the Court, the Trustee has paid to de-archive the emails of select hospital employees. Among them are emails between the Debtor and Richard Genovese that were sent and received within one year before the petition date. But St. Jude did not produce any of those emails. Based on this oversight, the Trustee questions whether St. Jude likewise failed to produce other responsive documents.

Perhaps it is the case that St. Jude mistakenly did not utilize appropriate search parameters, as we are confident that St. Jude would not intentionally disregard the Court's order. Whatever the cause of the oversight, we request confirmation that St. Jude is working to supplement its production promptly, and we are amenable to providing a reasonable amount of time for St. Jude to comply. If, on the other hand, St. Jude does not intend to broaden its search and produce additional documents, then we request a prompt telephone conference to discuss the matter.

Best regards,

/s/  *Julian P. Vasek*

Julian P. Vasek, Esq.

St.JudeReplyApp'x.042

4810-4703-4221v.1

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Julian P. Vasek, Esq.
Texas Bar No. 24070790
Fareed Kaisani, Esq.
Texas Bar No. 24104017
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

Exhibit "D"

ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| WALNUT HILL PHYSICIANS' | § | Case No. 17-32255-bjh-7 |
| HOSPITAL, LLC, | § | |
| | § | **Hearing: August 29, 2018 @ 9:30 a.m.** |
| Debtor. | § | |

### FEE APPLICATION COVER SHEET

| | |
|---|---|
| Fee Application: | Second Interim |
| Applicant: | Munsch Hardt Kopf & Harr, P.C. |
| Time Period: | November 1, 2017 through June 13, 2018 |
| Capacity: | General Counsel to Scott M. Seidel, Trustee |
| Retainer Received: | $0.00 |
| Amounts Previously Paid: | $199,701.50 ($162,592.24 fees + $37,109.25 expenses) |
| Amount Requested to Allow: | $482,040.45 ($449,082.00 fees + $32,958.45 expenses) |
| Amount Requested to Pay: | $392,224.05 ($359,265.60 fees + $32,958.45 expenses) |
| Number of Hours: | 1,204 |
| Highest Attorney Rate: | $674 (0.1 hours) |
| Lowest Attorney Rate: | $295 (91.8 hours) |
| Blended Rate: | $372.99 |

Dated: August 7, 2018.

## SECOND INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PAYMENT OF SAME

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt"), general counsel to Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "Estate") of Walnut Hill Physicians' Hospital, LLC (the "Debtor"), the debtor in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this its *Second Interim Application of Munsch Hardt Kopf & Harr, P.C. for the Allowance of Fees and Reimbursement of Expenses as General Counsel to Trustee and Request for Payment of Same* (the "Application"), respectfully stating as follows:

## I.      SUMMARY OF RELIEF REQUESTED

1.      By this Application, Munsch Hardt requests the Court's allowance, on an interim basis, of the fees and expenses incurred in its role as general counsel to the Trustee for the period of November 1, 2017 through July 13, 2018 (the "Subject Period"), as set forth fully on the invoice attached hereto as Exhibit "A" and incorporated herein.[1]  Munsch Hardt requests the interim allowance of fees in the amount of $449,082.00 (the "Requested Fees") and the reimbursement of expenses in the amount of $32,958.45 (the "Requested Expenses").  Munsch Hardt requests the interim payment of the same, prior to September 30, 2018, in the amount of $392,224.05, representing 80% of the Requested Fees and 100% of the Requested Expenses, on an interim basis and subject to full disgorgement.

---

[1]      To save photocopying and postage expenses, Munsch Hardt is not serving Exhibit "A" on all parties to this Bankruptcy Case.  However, any party wishing to obtain a copy of said Exhibit "A" may obtain one free of charge by contacting the undersigned counsel.  Additionally, the invoice is redacted in part related to ongoing investigations and strategy regarding potential litigation claims.

## II.  **BACKGROUND**

2.      The Debtor filed its voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on June 6, 2017 (the "Petition Date"), thereby initiating this Bankruptcy Case and creating its bankruptcy estate (the "Estate").

3.      The Trustee is the duly appointed Chapter 7 trustee of the Estate.

4.      The Court has jurisdiction over this Application under 28 U.S.C. § 1334.  Said jurisdiction is core under 28 U.S.C. § 157(b)(2).  Venue of the Bankruptcy Case before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

## III.  **RETENTION OF MUNSCH HARDT**

5.      Prior to the Petition Date, the Debtor owned and operated a short term acute care hospital located at 7502 Greenville Avenue, Dallas, Texas (the "Hospital").  The Debtor, after prolonged financial distress, ceased operations immediately prior to the Petition Date.  A large amount of personalty was left at the Hospital as of the Petition Date, while many pressing issues were immediately present, including the existence of dangerous materials, highly controlled pharmaceuticals, the threatened cancellation of insurance, the need to preserve financial and patient records, the Debtor's 401k plan (of dear importance to former employees), the collection of accounts receivables, negotiations with many creditors and lessors, and the preservation of assets and causes of action of the Estate.

6.      Critically, and remarkably, the Debtor left itself (and therefore the Trustee) with zero dollars in its accounts on the Petition Date.  The Trustee therefore faced the very difficult task of complying with his duties and administering the Estate without any funds, while any

SECOND INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PAYMENT OF SAME —Page 3

future funds that may be collected appeared to be fully encumbered. Hindering the process, the Debtor's schedules and statements were incomplete and far from helpful.[2]

7.      The Trustee almost immediately approached Munsch Hardt to assist him, as general counsel, on these and all matters affecting the Estate and its administration. The Trustee had a need for a larger, full-service law firm due to the size, number, and complexity of issues involved. Munsch Hardt agreed to the representation, although Munsch Hardt noted then as it notes now that it was facing a significant risk of non-payment while being asked to extend significant credit to the Estate, including for out-of-pocket third-party expenses.

8.      On July 5, 2017, the Trustee filed his application for authority to retain Munsch Hardt as his general counsel.[3]  On August 2, 2017, the Court entered its order granting said application and authorizing the Trustee's retention of Munsch Hardt, effective as of the Petition Date.[4]  Specifically, the Court approved the Trustee's retention of Munsch Hardt on an hourly basis, subject to interim and final fee applications and allowance, for all matters that may arise in the Bankruptcy Case and on which the Trustee may need assistance.[5]

9.      Munsch Hardt has received no retainer for this representation.[6]  On November 22, 2017, Munsch Hardt filed its first interim application for fees and expenses (the "First Interim Application"), covering the period between the Petition Date and November 3, 2017.[7]  On December 28, 2017, the Court entered its order approving the First Interim Application, and

---

[2] *See* Doc. Nos. 59, 60.

[3] *See* Doc. No. 67.

[4] *See* Docket No. 138.

[5] *See id.* at p. 2; Doc. No. 67 at p. 4–5.

[6] *See* Doc. No. 67 at p. 7; Doc. No. 67–1 at p. 4.

[7] *See* Doc. No. 244.

authorizing interim payment to Munsch Hardt in the amount of $199,701.50, representing 50% of its allowed interim fees and 100% of its allowed interim expenses.[8]

## IV.    SUMMARY OF SERVICES

10.    Exhibit "A" hereto details the Requested Fees and Requested Expenses the subject of this Application.  A summary of the same is provided below.

### A.    TASK 2—GENERAL ($13,262.00)

11.    During the Subject Period, Munsch Hardt incurred $13,262.00 in fees related to general matters within the scope of its representation, and not allocated to other tasks.  These services included, among other things, attending to issues related to the retention of patient records under section 351 of the Bankruptcy Code;[9] coordinating efforts to remove the Debtor's servers from the basement of the hospital building; undertaking to establish an administrative expense claims bar date;[10] working with ScanSTAT and Cerner to generate a mechanism for providing access to patient medical records;[11] coordinating with the Landlord to provide access to the hospital premises for certain limited purposes, including the retrieval of property of the Estate; and multiple conferences with the Trustee to formulate strategy for advancing the case.

12.    These services were actual and necessary services because they assisted the Trustee in complying with his various duties under the Bankruptcy Code, and they were beneficial to the Estate for the same reason.

---

[8] See Doc. No. 212.

[9] See Doc. No. 183.

[10] See Doc. No. 238.

[11] See Doc. Nos. 155, 234

---

**B.    TASK 3—ESTATE PROFESSIONALS' RETENTION/FEE APPLICATIONS ($5,222.00)**

13.    During the Subject Period, Munsch Hardt incurred $5,222.00 in fees related to the Trustee's retention and compensation of his counsel and himself.  Specifically, this category includes services rendered in connection with drafting and prosecuting Munsch Hardt's First Interim Application and the Trustee's first interim application for compensation and reimbursement of expenses.[12]  These services were actual and necessary services and expenses, as compliance with the Bankruptcy Code for the retention of professionals is necessary, and they benefited the Estate by enabling the Trustee to obtain professional assistance and advice.  Such services are specifically provided for in section 330 of the Bankruptcy Code.

**C.    TASK 4—OTHER PROFESSIONALS' RETENTION/FEE APPLICATIONS ($2,986.00)**

14.    During the Subject Period, Munsch Hardt incurred $2,986.00 in fees related to retention of professionals other than the Trustee and his counsel.  Of particular significance, Munsch Hardt assisted the Trustee with employing ScanSTAT to assist the Trustee in managing patient records and fulfilling requests for copies of the same from former hospital patients.[13]  These services were actual and necessary services and expenses, as compliance with the Bankruptcy Code for the retention of professionals is necessary, and they benefited the Estate by enabling the Trustee to obtain professional assistance and advice.  Such services are specifically provided for in section 330 of the Bankruptcy Code.

**D.    TASK 6—EMPLOYEE ISSUES ($12,251.00)**

15.    During the Subject Period, Munsch Hardt incurred $12,251.00 in fees related primarily to the Debtor's 401k plan, though Munsch Hardt attorneys also had substantial

---

[12] *See* Doc. Nos. 67, 238

[13] *See* Doc. No. 234.

correspondence with former hospital employees regarding their form W-2s.[14]  This task is somewhat also captured in Task 2, general services.  These services were actual and necessary services, which benefited the Estate, because the Trustee was required to deal with the 401k issues, comply with ERISA and related laws and regulations, and because the successful termination and transition of the same to a new provider preserved employee funds (approximately $3.5 million) and retirement and avoided potentially large priority claims against the Estate.  As with other tasks the Trustee was forced to undertake, this is something that the Debtor's management could and should have attended to for less cost and at far less burden, but did not.

## E.    TASK 7—AUTOMATIC STAY ($11,587.00)

16.    During the Subject Period, Munsch Hardt incurred $11,587.00 in fees related to threatened or filed motions for relief from the stay.[15]  These services included correspondence with various creditors' attorneys regarding stay violations, which typically resulted in amicable resolutions of the underlying issues.  In one instance, however, the Trustee, through Munsch Hardt, spent significant time dealing with an alleged creditor's ongoing stay violations.  Tony Das filed a petition in state court alleging various claims against the Debtor's officers and directors, including breach of fiduciary duty.  Because such claims are property of the Estate, the Trustee made demand on Das to withdraw such claims, or otherwise revise his petition.  When Das refused to amend his claims so as to except Estate claims, the Trustee, with Munsch Hardt's assistance, prepared an prosecuted a motion to enforce the automatic stay, which the parties

---

[14] *See* Doc. No. 103.

[15] *See, e.g.,* Doc. Nos. 18, 29, 37 & 137 (Capital One); 31, 65, 73, 86, 99 & 143 (Premium Assignment Corporation); 52, 81 & 95 (GE HFS, LLC); 83 & 145 (The Huntington National Bank); 88 & 144 (Walnut Hill I LLC and Walnut Hill II LLC); 128 & 160 (Robin E. Phelan); 165 & 178 (Yolanda Hayes); 271, 273 & 289 (Cardinal Health 110 LLC and Cardinal Health 200, LLC).

eventually resolved by an agreed order granting the motion on the eve of the hearing.[16] Such services were actual and necessary services because the automatic stay is one of the most powerful provisions of the Bankruptcy Code, and it must not be undermined. The Trustee is charged with collecting and reducing to money property of the Estate, and Munsch Hardt assisted him with ensuring that a creditor did not usurp the Trustee for the creditor's sole benefit. As a result, Munsch Hardt's services also provided a commensurate benefit to the estate because the Trustee eventually resolved the dispute with Das favorably.

## F.    TASK 8—CLAIMS ADMINISTRATION AND OBJECTIONS ($12,170.00)

17.    During the Subject Period, Munsch Hardt incurred $12,170.00 in fees related to claims administration and claims objections. These services primarily included addressing issues related to administrative expense claims, including the establishment of an administrative expense claims bar date, reviewing timely-filed administrative expense claims, and drafting objections to such claims.[17] Some of those objections were later consolidated with preference adversaries that have unique task codes, so there may be some overlap between this task and those. These were actual and necessary services because the Trustee is charged with examining claims and objecting to them if advisable, and he required the assistance of Munsch Hardt to do so. The administrative claims in particular involve complex issues that require the attention of sophisticated bankruptcy counsel.

---

[16] *See* Doc. No. 318, 349 & 363.

[17] *See, e.g.*, Docket Nos. 238 & 248 (*Motion to Set Administrative Claim Bar Date and to Approve Procedures Related to Same*); 200 & 211 (St. Jude Medical S.C., Inc.); 260, 263, 272 (C.R. Bard, Inc.); 262, 268, 269 & 338 (Reliant Energy Retail Services, LLC); 270 & 337 (Cardinal Health 110 LLC, Cardinal Health 200, LLC; 284 & 340 (Boston Scientific Corporation); 285 & 342 (HC-7502 Greenville Avenue, LLC); 286, 288 & 339 (Sirtex Medical, Inc.).

---

SECOND INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PAYMENT OF SAME —Page 8

## G.   TASK 9—AVOIDANCE LITIGATION ($123,062.50)

18.   During the Subject Period, Munsch Hardt incurred $123,062.50 in fees related to avoidance litigation.  In particular, Munsch Hardt evaluated the Estate's preference claims and made preference demands on fifty-five entities.  For those potential preferences where the amount in controversy is less than $100,000, the Trustee, via Munsch Hardt, obtained an order setting forth omnibus procedures permitting the Trustee to settle such preferences without additional court approval, provided that the settlements met certain criteria.[18]  In connection with those procedures, the Trustee, via Munsch Hardt, obtained settlements with at least ten defendants, totaling some $199,645.62.[19]  Munsch Hardt submits that the omnibus procedures order permitted the Trustee to obtain valuable settlements without additional 9019 motions required.

19.   Separately, to date, the Trustee has filed twenty preference adversaries, five of which have already been resolved.[20]  All in all, Munsch Hardt has assisted the Trustee with settling or otherwise resolving approximately thirty of the fifty-five preference demands and has collected more than $500,000.00 in unencumbered settlement proceeds for the benefit of the Estate.  Four of the unresolved preference adversaries seek to avoid transfers totaling more than $1.6 million (and which adversaries also involve hundreds of thousands of dollars in alleged 503(b)(9) administrative claims), and the Trustee continues to prosecute those adversaries

---

[18] *See* Doc. No. 236.

[19] *See* Doc. Nos. 319, 336, 362.

[20] Resolved preference adversary proceedings included the following defendants and adversary proceeding numbers: (i) Accountable Healthcare Staffing, Inc. (18-3042); (ii) Alere Informatics, Inc. (18-3043); (iii) Biomet Trauma, LLC (18-3044); (iv) Edwards Lifesciences (U.S.), Inc. (18-3045).  The adversary proceeding against Promise Hospital of Dallas, Inc. (18-3034) was filed on the basis of outstanding accounts-receivables owed to the Debtor.

diligently with Munsch Hardt's assistance.[21] These were actual and necessary services because the Trustee must investigate and attempt to monetize avoidance actions. And the benefit to the Estate is self-evident, since the Trustee has already collected more than half a million dollars for the Estate and has laid the groundwork to collect much more.

## H.   TASK 10—GENERAL LITIGATION AND CONTESTED MATTERS ($28,368.50)

20.   During the Subject Period, Munsch Hardt incurred $28,368.50 in fees related to general litigation and contested matters. Services provided in this category consisted primarily of efforts to resolve an ongoing dispute with Cerner Health Services, an entity that maintains an electronic database containing the Debtor's accounting and patient records. The Trustee needed access to the electronic records in order to facilitate, among other things, the collection of accounts receivable. Similarly, the Trustee required access to electronic patient records in order to fulfill requests from the Debtor's former patients for copies of their medical records. Upon the filing of the case, the Trustee entered into agreed orders with Capital One, National Association ("Capital One") and Cerner pursuant to which more than $230,000.00 of the $275,000.00 of cash collateral made available by Capital One would be made available to pay Cerner for continued access to these databases.[22]

21.   However, for reasons that are still not wholly clear now, the Trustee quickly discovered that Cerner's services were well below par. Accordingly, alternative arrangements had to be made to ensure that patient records could be made accessible to patients requesting the

---

[21] These include (i) Cardinal health 110 LLC, *et al.* (18-3075); (ii) Comprehensive Pharmacy Services, LLC (18-3082); (iii) Boston Scientific Corporation (18-3217), (iv) Summit Emergency Physicians, PLLC (18-3065), and St. Jude Medical S.C., Inc. (18-3033).

[22] *See* Doc. Nos. 137, 155 & 171. Pursuant to the agreed order between the Trustee and Capital One, Capital One made available some $275,000 of its cash collateral for the benefit of the Estate. Cerner, having all the leverage, took a hardline stance and demanded payment of $233,500 of the same to permit continued access to patient records and accounts receivable data, and in the process negotiated a release of significant preference liability. Despite this, access to both types of data was intermittent, interrupted, and wholly inadequate.

same, and that accounts receivable data could be made available for the continued collection of bills, which grew more stale as time passed. Thus, the Trustee filed pleadings alleging that Cerner was exercising control over property of the Estate in violation of the Bankruptcy Code. Munsch Hardt also assisted the Trustee with drafting motion to examine Cerner under rule 2004 and to require Cerner to turn over the Debtor's records under section 542.[23] Ultimately, with the assistance of Munsch Hardt, the Trustee was able to negotiate an amicable resolution of these issues with Cerner.[24] These were actual and necessary services because the collection of accounts receivable is an expected endeavor of a chapter 7 trustee, which becomes even more critical when the same vendor also possesses former patient records.

## I. TASK 13—505 AND TAX ISSUES ($11,842.00)

22. During the Subject Period, Munsch Hardt incurred $11,842.00 in fees related to issues associated with business personal property taxes. Generally speaking, Munsch Hardt provided services under this task code that fall into two broad categories. First, Munsch Hardt assisted the Trustee to successfully negotiate an allocation of business personal property taxes among the Debtor's secured creditors and to provide them subordinated administrative expense claims to the extent the Debtor's acquiescence to Dallas County's tax valuation diminished the value of their collateral. These efforts resulted in a court-approved stipulation to adequately protect those creditors.[25] Second, the Trustee, with Munsch Hardt's assistance, prosecuted a motion under section 505 of the Bankruptcy Code to protest Dallas County's tax valuation for

---

[23] *See* Doc. No. 312.

[24] *See* Doc. Nos. 344 & 359.

[25] *See* Doc. 243 & 258.

---

2017.[26] These efforts were successful because the Dallas County Appraisal District ultimately agreed to reduce its appraisal of the Debtor's business personal property from $14,314,904.46 to $5,750,000.00, thereby reducing the 2017 tax burden from approximately $389,000.00 dollars to approximately 156,000.00 dollars. These were actual and necessary services because tax claims are entitled to secured and priority treatment in bankruptcy, and the Trustee has a duty to review and challenge claims when appropriate. Reducing the amount of Dallas Count's claim was therefore necessary to pave the way for junior creditors to receive a dividend in this case.

**J.**   **TASK 18—D&O LITIGATION ($74,896.00)**

23.    During the Subject Period, Munsch Hardt incurred $74,896.00 in fees related to D&O litigation. Exhibit "A" is redacted for these services, although the paper copy the Court will receive will not be redacted, and Munsch Hardt requests that the Court review the same *in camera*. It is no secret that the Trustee is reviewing potential claims against the Debtor's former officers and directors, as this may turn out to be a major unencumbered asset of the Estate, and the Estate's rights with respect to insurance regarding the same. This necessitates a detailed review of potential facts and law, and the formulation of appropriate strategy and options. Past that, there is not much more the Trustee can say at this time without endangering the privilege, and also because his review is not complete. The benefit of these services cannot be decided at this time, since no litigation has been filed or concluded, but these are actual and necessary services required to assess a potential major asset of the Estate and, if appropriate, to attempt to monetize the same.

---

[26] *See* Doc. No. 173, 176, 192, 209 & 220.

---

## K.   TASK 19—ACCOUNTS RECEIVABLE ($15,634.00)

24.   During the Subject Period, Munsch Hardt incurred $15,634.00 in fees related to accounts receivables collections.  The Debtor's receivables total almost $40 million, although no one believes that the ultimate value is nearly that high.  Munsch Hardt's services included assisting the Trustee with negotiating with Capital One, which holds the first lien on the receivables, assisting the Trustee with collection efforts, and continuing the process of making demand and preparing litigation against non-paying account debtors.  These are actual and necessary services required to preserve and monetize property of the Estate, and they are beneficial because the Estate earns a commission for receivables collection while, because it is possible that Capital One will be paid off in full from receivables, any remaining upside from the book of receivables will inure to the benefit of the Estate (and hence a main reason why the Trustee is assisting Capital One with the process as the present time, to ensure maximum recovery).

## L.   TASK 20—ST. JUDE MEDICAL ($39,318.00)

25.   During the Subject Period, Munsch Hardt incurred $39,318.00 in fees related to litigation with St. Jude Medical S.C., Inc.  The Trustee filed an adversary proceeding against St. Jude to recover preferential transfers totaling $460,292.16, and St. Jude filed an administrative expense claim under section 503(b)(9) of the Bankruptcy Code for $131,790.36.  This is one of four adversary proceedings that requires heightened attention from Munsch Hardt due to the large amount in controversy, and this one in particular has required more work than the other three because St. Jude has taken aggressive litigation positions.  For example, following St. Jude's refusal to produce any emails in discovery, the Trustee filed, and the Court substantially granted, a motion to compel on this issue.  Discovery disputes with St. Jude remaining ongoing,

however.  Despite the Court's order compelling production of emails, St. Jude has only produced twelve pages of emails.  This adversary proceeding also involves unique issues related to consignment that set this preference analysis apart from others.

26.     These were actual and necessary services because the Trustee is charged with evaluating and opposing objectionable claims, as well as with collecting and reducing to money property of the Estate.  Given that most if not all of the Debtor's tangible personal property was either fully encumbered or leased, litigation claims constitute the principal means of recovery for unsecured creditors.  The Trustee is therefore duty-bound to prosecute these preference claims—especially the large ones—in order to achieve a dividend for creditors other than those who were secured.

## M.     TASK 21—NORTON ROSE FULBRIGHT ($11,250.00)

27.     During the Subject Period, Munsch Hardt incurred $11,250.00 in fees related to litigation with Norton Rose Fulbright.  Norton Rose received $340,335.00 in transfers from the Debtor during the ninety days before the Petition Date.  Ultimately, after extensive investigation and negotiations, and a 9019 motion, the Court approved a settlement whereby  Norton Rose paid the Estate $100,000.00 in exchange for releases.  Considering how comparatively low Munsch Hardt's fees are for this task, there can be no question that Munsch Hardt's efforts assisted with producing a material benefit for the Estate.  Likewise, these services were actual and necessary because the Estate would be $100,000.00 poorer if Munsch Hardt had not provided them.

## N.     TASK 22—SIRTEX MEDICAL ($10,463.50)

28.     During the Subject Period, Munsch Hardt incurred $10,463.50 in fees related to litigation with Sirtex Medical, Inc.  Munsch Hardt assisted the Trustee with reviewing transfers

that Sirtex received before the Petition Date and determined that Sirtex received $560,483.00 in potentially preferential transfers. Ultimately, after extensive investigation and negotiations, and a 9019 motion, the Court approved a settlement whereby Sirtex paid $116,000.00 to the Estate. Sirtex also agreed to waive its asserted administrative expense claim in the amount of $48,000.00. These were actual and necessary services because the Trustee must seek to recover on meritorious claims to avoid preferential transfers, and there was an actual, material benefit to the Estate given the comparatively low fees associated with the recovery.

**O.      TASK 23—CARDINAL HEALTH ($21,753.50)**

29.      During the Subject Period, Munsch Hardt incurred $21,753.50 in fees related to litigation with Cardinal Health 110, LLC and Cardinal Health 200, LLC. After reviewing prepetition transfers, the Trustee, with Munsch Hardt's assistance, determined that Cardinal received transfers totaling $384,535.37 that constituted avoidable preferences. Informal settlement negotiations with Cardinal were not as fruitful as they were with Norton Rose and Sirtex, so Munsch Hardt assisted the Trustee with preparing a complaint and filing an adversary proceeding.[27] The parties agreed to consolidate Cardinal's administrative and non-priority claims, and the parties are currently engaged in discovery.[28] This adversary proceeding is unique because it also involves allegations that Cardinal violated the automatic stay, refused to turn over Estate property, and received unauthorized postpetition transfers. Munsch Hardt's services were actual and necessary because recovering avoidable transfers is critical in this case, and the Estate benefits from efforts to increase its capacity to repay creditors.

---

[27] *See* Adversary Proceeding No. 18-3075, *Scott M. Seidel v. Cardinal Health 110 LLC, Cardinal Health 200, LLC, and Cordis Corporation*.

[28] *See* Doc. No. 356.

**P.     TASK 24—BOSTON SCIENTIFIC ($16,676.50)**

30.     During the Subject Period, Munsch Hardt incurred $16,676.50 in fees related to litigation with Boston Scientific Corporation.  The Trustee, with Munsch Hardt's assistance, determined that Boston Scientific received preferential transfers totaling $416,716.57, and Boston Scientific filed an administrative expense claim under section 503(b)(9) for $109,558.00. After informal settlement negotiations were not productive, Munsch Hardt assisted the Trustee with preparing a complaint and filing an adversary proceeding, and the parties agreed to consolidate Boston Scientific's 503(b)(9) claim.[29]  The litigation is in its early stages, but the Trustee is optimistic that it will produce results.  Based on the Trustee's and Munsch Hardt's track record with respect to avoidance actions in this case, the benefit to the Estate is self-evident.  Furthermore, services rendered in connection with this task code are reasonable and necessary because the Trustee must attempt to recover on meritorious avoidance actions.

**Q.     TASK 25—PROMISE HOSPITAL ($13,834.50)**

31.     During the Subject Period, Munsch Hardt incurred $13,834.50 in fees related to litigation with Promise Hospital of Dallas, Inc.  After reviewing the Debtor's books and records regarding accounts receivable, the Trustee, with Munsch Hardt's assistance, determined that the Estate held a valid claim against Promise Hospital for $46,752.63.  Munsch Hardt therefore assisted the Trustee with preparing a complaint and filing an adversary proceeding against Promise Hospital to collect the receivable.[30]  Promise Hospital never answered the suit, and the Trustee ultimately obtained a default judgment.  However, the Court determined that only the District Court could enter the default judgment; therefore, Munsch Hardt assisted the Trustee

---

[29] *See* Adversary Proceeding No. 18-3217, *Scott M. Seidel v. Boston Scientific Corporation*.

[30] *See* Adversary Proceeding No. 18-3034, *Scott M. Seidel v. Promise Hospital of Dallas, Inc.*

---

with preparing proposed findings of fact and conclusions of law for the Court to include in its report and recommendation to the District Court. Munsch Hardt spent additional time thereafter assisting the Trustee with preparing post-judgment discovery requests. These were actual and necessary services because the Estate retains an interest in accounts receivables. To the extent the Trustee is able to collect those accounts, doing so will also reduce the amount of Capital One's unsecured deficiency claim, which will undoubtedly benefit the Estate, especially from the perspective of unsecured creditors. Moreover, the Trustee has been awarded Munsch Hardt's fees and expenses incurred in this matter.

**R.      TASK 26—LANDLORD LITIGATION ($20,555.00)**

32.      During the Subject Period, Munsch Hardt incurred $20,555.00 in fees related to litigation with the hospital landlord, HC-7502 Greenville Avenue, LLC. The landlord has asserted an administrative rent claim for approximately $2.5 million, which threatens to substantially dilute or eliminate the recovery of all other unsecured creditors in this case. The Trustee, with Munsch Hardt's assistance, therefore undertook significant analysis of this claim. Based on his review and research, the Trustee prepared an objection to the claim, with Munsch Hardt's assistance, which is currently pending.[31]  The Trustee also initiated an adversary proceeding to avoid the lease and recover prepetition lease payments.[32]  These were actual and necessary services because the landlord's administrative rent claim renders the Estate almost hopelessly administratively insolvent. If the Trustee is not able to reduce the amount of this claim significantly, then there is a chance that the Estate will never become administratively solvent. The benefit to the Estate is therefore unmistakable.

---

[31] *See* Doc. No. 285.

[32] *See* Adversary Proceeding No. 18-3219, *Scott M. Seidel v. HC-7502 Greenville Avenue, LLC and Capital One, N.A.*

**S.**    <u>EXPENSES ($32,958.45)</u>

33.     During the Subject Period, Munsch Hardt advanced the Trustee $34,532.24 in expenses paid out to third parties. For the reasons explained below, however, Munsch Hardt is only seeking allowance of expenses totaling $32,958.45 at this time.

34.     Many of these expenses, more than $11,000.00, are for copying and service costs to serve various pleadings, motions, notices, and orders. This is a large amount, necessitated by the fact that the Debtor's mailing matrix was thirty pages long, consisting of almost 1,000 parties. That meant that many documents had to be served on all of these parties. Only after the Bar Date expired could the Trustee, under the Rules, use a much smaller service list of only those people who filed claims. These were actual and necessary expenses as compliance with the Rules is required, and they were beneficial because, otherwise, the Trustee could not file and prosecute various pleadings.

35.     The expenses include $700.00 in filing fees for adversary proceedings. These were actual and necessary expenses required to file pleadings, and they were beneficial since the Trustee was able to obtain the relief sought.

36.     Although the invoice includes charges for working meals totaling $1,573.79, Munsch Hardt is not seeking reimbursement of the same at this time, reserving its right to seek such reimbursement as part of a final fee application.

37.     The Invoice also includes $15,900.05 in witness/expert fees and costs associated with professional services and consulting. These expenses were actual, necessary, and beneficial because the Trustee requires the assistance of certain experts and consultants in connection with various aspects of the litigation in this case. As already discussed herein, such litigation will provide the only avenue for general unsecured creditors to recover a dividend.

38.     All of the Requested Expenses represent actual expenses advanced by Munsch Hardt on behalf of the Trustee.  Munsch Hardt makes no "profit" on any of these expenses.  Internal photocopying is billed at 20 cents per page, while external copying for service is billed at 12 cents per page.  All of these expenses were reasonable and were necessary to enable the Trustee to comply with various requirements and duties.

## V.     ARGUMENTS AND AUTHORITIES

### A.     APPROVAL UNDER BANKRUPTCY CODE

39.     Under section 330 of the Bankruptcy Code, the Court may allow reasonable compensation for actual, necessary professional services rendered by a professional in the case, determining the reasonableness of the compensation requested based upon the nature, extent and value of such services to the estate.  Similarly, the Court may allow the reimbursement of actual, necessary expenses incurred by a professional in connection with the rendition of services.  Specifically, section 330 provides in pertinent part:

(a)(1)  . . . the court may award to . . . a professional person employed under section 327 . . . –

    (A)     reasonable compensation for actual, necessary services rendered by the … professional person, or attorney and by any paraprofessional person employed by any such person;

    (B)     reimbursement for actual, necessary expenses.

. . .

    (3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

    (A)     the time spent on such services;

    (B)     the rates charged for such services;

---

SECOND INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PAYMENT OF SAME —Page 19

> (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(1) & (3) (2010).

40.    The Fifth Circuit has held that the five factors set out in section 330(a)(3) of the Bankruptcy Code are the most relevant to fee determinations in bankruptcy cases. *See, e.g., Peele v. Cunningham (In re Texas Securities, Inc.)*, 218 F.3d 443, 445 (5th Cir. 2000). Of additional relevance are the twelve factors set forth by the Fifth Circuit in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974).

41.    Here, application of any of the Bankruptcy Code's or the Fifth Circuit's factors support the allowance of the Requested Fees and the Requested Expenses. As explained above, and as listed in detail on Exhibit "A", Munsch Hardt's Requested Fees and Requested Expenses:

- are reasonable based on the hourly rates charged in relation to the local market and in relation to the rates charged by comparable professionals, especially because the services of other attorneys with unique, non-bankruptcy expertise was necessary, including with respect to the Debtor's 401k, transfer of controlled property, and extensive analysis of loan and lease documents;

- are reasonable based on the experience and hourly rate of the attorneys used, meaning that Munsch Hardt staffed this representation efficiently to ensure that there was no "overkill," as evidenced by the $372.99 blended rate which, while on the higher end for a Chapter 7 case, was necessitated by the fact that this case involves uniquely sophisticated issues;

- are reasonable based on the allocation of work and staffing of the representation, and the avoidance of duplication and unnecessary services;

- are reasonable based on the results produced;

- are beneficial because they enabled the Trustee to comply with his duties, sell assets, solve un-abandonable issues, reach numerous agreements with various parties, and to rapidly advance the Bankruptcy Case and the administration of the Estate, all for the benefit of all creditors and parties-in-interest;

- represent actual time spent by Munsch Hardt on the representation employing contemporaneous and detailed time entries in the process; and

- were incurred by persons skilled and experienced in their various fields of expertise and practice.

42. Therefore, based on the representations in this Application, Exhibit "A" hereto, the Court's own familiarity with the Bankruptcy Case and the proceedings therein, and on any evidence presented by Munsch Hardt at the hearing on this Application, Munsch Hardt believes that its Requested Fees and Requested Expenses are fully allowable.

**B.    INTERIM APPROVAL**

43. Pursuant to section 331 of the Bankruptcy Code, this Court may award interim fees and expenses, subject to the filing of a final fee application at the appropriate time.   Munsch Hardt is requesting the payment of $392,224.05 of the Requested Fees and Requested Expenses at this time, representing 80% of the Requested Fees and 100% of the Requested Expenses, subject to full disgorgement.

**C.    INTERIM PAYMENT**

44. The Bankruptcy Code expressly allows an interim payment, subject to disgorgement.  This is especially appropriate here where, for fourteen months, Munsch Hardt has been effectively financing this case and is being asked to continue funding it for months or years, and the only reason why the Estate has any unencumbered funds and has been able to pay more

SECOND INTERIM APPLICATION OF MUNSCH HARDT KOPF & HARR, P.C. FOR THE ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES AS GENERAL COUNSEL TO TRUSTEE AND REQUEST FOR PAYMENT OF SAME —Page 21

than $5 million was because of Munsch Hardt's assistance to the Trustee in achieving these results. It appears that the Estate may be administratively insolvent at this time, in light of a threatened large administrative claim of the landlord, along with other 503(b)(9) and administrative claims. However, that should not prevent an interim payment, since the payment will be subject to disgorgement, since Munsch Hardt has more than sufficient history, size, revenue, and credit to comply with any disgorgement, and since, at 80% of Requested Fees (in addition to considering the fact that the previous interim payment was only 50% of the allowed interim fees), there is a significant cushion in the event of any future disgorgement.

**D.**     <u>SERVICE OF INVOICE (EXHIBIT "A")</u>

45.     To save the Estate what would otherwise be sizable service costs, Munsch Hardt is not serving Exhibit "A" hereto on all creditors. Nevertheless, any creditor who wishes to obtain a copy of said Exhibit "A" may obtain one free of charge by contacting one of the undersigned counsel at Munsch Hardt.

## VI.     <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Munsch Hardt respectfully requests that the Court enter an order: (i) granting this Application; (ii) approving the Requested Fees and Requested Expenses on an interim basis only, subject to final approval; (iii) authorizing and directing the Trustee to pay Munsch Hardt $392,224.05 on an interim basis and subject to disgorgement, to be paid by the Trustee by September 30, 2018; and (iv) granting Munsch Hardt such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 7th day of August, 2018.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Davor Rukavina*
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Thomas D. Berghman, Esq.
     Texas Bar No. 24082683
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     Fareed Kaisani, Esq.
     Texas Bar No. 24104017
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75201-6659
     Telephone:  (214) 855-7500
     Facsimile:  (214) 855-7584

**ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE**

### CERTIFICATE OF COMPLIANCE

This is to certify that I have read the foregoing Application, that to the best of my knowledge, information and belief, formed after reasonable inquiry, the compensation sought is in conformity with the Court's Guidelines for Compensation and Expense Reimbursement of Professionals, and the compensation is billed at rates, in accordance with practices, no less favorable than those customarily employed by Munsch Hardt Kopf & Harr, P.C. and generally accepted by its clients.

By: /s/ *Davor Rukavina*
     Davor Rukavina, Esq.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 7th day of August, 2018, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof and that, additionally, on the same day he caused true and correct copies of this document, without the exhibit thereto, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached Service List.

By: /s/ *Davor Rukavina*
     Davor Rukavina, Esq.