UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | . | Case No. 17-32255-BJH |
| | . | |
| WALNUT HILL PHYSICIANS | . | |
| HOSPITAL, LLC | . | |
| | . | |
| Debtor. | . | |
| . . . . . . . . . . . . . | | |
| SCOTT M. SEIDEL, TRUSTEE,. | | Adv. No. 18-03033-BJH |
| | | |
| Plaintiff, | . | |
| | . | 1100 Commerce Street |
| v. | . | Dallas, TX 75242 |
| | . | |
| ST. JUDE MEDICAL S.C., | . | |
| INC., | . | |
| | . | |
| Defendant. | . | June 21, 2018 |
| . . . . . . . . . . . . | | 9:09 a.m. |

TRANSCRIPT OF MOTION TO COMPEL RE: DISCOVERY
DISCOVERY RESPONSES AND PRODUCTION FILED BY
PLAINTIFF SCOTT M. SEIDEL
BEFORE HONORABLE DOUGLAS D. DODD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plaintiff:          Munsch, Hardt, Kopf & Harr, PC
                            By:  DAVOR RUKAVINA, ESQ.
                                 JULIAN P. VASEK, ESQ.
                            500 N. Akard Street, Suite 3800
                            Dallas, TX 75201


Audio Operator:             Nicole Whittington


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609) 586-2311     **Fax No. (609) 587-3599**

StJudeResponseContemptApp'x.001

2

APPEARANCES (Cont'd):

For the Defendant:     Kohner, Mann & Kailas, S.C.
                           By: MELINDA A. BIALZIK, ESQ.
                               SAMUEL C. WISOTZKEY, ESQ.
                          Washington Building, Second Floor
                          Barnabas Business Center
                          4650 N. Port Washington Road
                          Milwaukee, WI 53212

                          Padfield & Stout, L.L.P.
                          By: JOHN E. JOHNSON, ESQ.
                          705 Ross Avenue
                          Dallas, TX 75202

For Corner Corporation:  Fishman Jackson Ronquillo PLLC
                          By: MARK H. RALSTON, ESQ.
                          13155 Noel Road
                          Tower 3, Suite 700
                          Dallas, Texas 75240

- - -

St.JudeResponseContemptAppx.DOX

WWW.JJCOURT.COM

3

1          (The following is the requested excerpted portion

2               of the proceedings.)

3        MS. BIALZIK:  Good morning, Your Honor.  I didn't get

4  a chance to make my appearance before.  I am Melinda Bialzik,

5  here with my colleague Samuel Wisotzkey from Kohner, Mann &

6  Kailas in Wisconsin on behalf of St. Jude.  Thank you.

7        THE COURT:  Good morning.

8        MR. RUKAVINA:  May I begin, Your Honor?

9        THE COURT:  You may.

10       MR. RUKAVINA:  Your Honor, obviously we're here on

11  the trustee's motion to compel discovery, and I think -- if I

12  can give Your Honor just a brief kind of a background of how we

13  see this case.  I've been doing this for 17 years.  I've never

14  tried a preference case.  I was a law clerk for two years to

15  Judge Robert L. Jones.  He never tried a preference case.  The

16  trustee has been a trustee for almost 30 years and he can't

17  remember if he's ever tried a preference case.  And the reason

18  why we don't try preference cases frankly is because capable

19  attorneys, knowing all the facts, knowing the law tend to know

20  where a preference case should settle and, therefore, they

21  settle them.

22        In this case, Your Honor, we've sent 60 preference

23  demand letters.  We've already settled 20 preferences without

24  the need for filing suit.  We have filed only a handful of

25  suits, about ten suits, and those were filed for one of two

4

1  reasons, either the preference defendant did not get back to us

2  on our preference communications and demands, or the case

3  involves unique facts, such as Your Honor will hear is the case

4  here with respect to a consignment agreement and also a

5  503(b)(9).

6          So all that is to say that trustee and counsel in

7  order to be able to do their job and efficiently administrate

8  an estate and not burden courts with needless actions need to

9  have discovery.  They need to have information, so they can

10 make informed decisions.

11          And St. Jude, Your Honor, in this case, despite

12 months of waiting for discovery, has not afforded us reasonable

13 discovery, such that we can take additional discovery or even

14 form a final opinion as to what the theory of the case is and

15 where this case should go.

16          There are a few unique facts about this case that I'm

17 sure the Court has seen in our moving papers.  St. Jude has

18 filed a $130,000 503(b)(9) claim.  503(b)(9), as the Court of

19 course knows, requires amongst other things that St. Jude prove

20 ordinary course.  Ordinary course is also an affirmative

21 defense.  It also requires that St. Jude prove value.  So we

22 have a $130,000 503(b)(9) in addition to the large preference.

23          The other unique fact about this case is that the

24 trustee has been informed and I think -- I don't know if

25 there's a dispute about this, that St. Jude mistakenly

5

1  delivered the same shipment twice on the eve of bankruptcy.  In
2  other words, the debtor made an order, placed an order for X, Y
3  and Z, St. Jude delivered X, Y and Z, and then mistakenly
4  delivered X, Y and Z again.  Just yesterday we went to the
5  hospital, the landlord finally permitted us access, and we took
6  these boxes of what was delivered mistakenly we were informed
7  by the debtor's former manager.  That's important because this
8  again goes to a 503(b)(9) and a new value analysis and,
9  therefore, why communications with the debtor are important.

10        The third thing that makes this case unique is, as
11  Your Honor has seen in our appendix, Exhibit I, there was a
12  consignment agreement in place here, and as we have briefed,
13  consignment governed by the UCC can take one of two forms and
14  which of those forms it is basically decides whether title
15  transfers and when title transfers.  That's critical for any
16  new value analysis.  That's critical for any preference
17  analysis.

18        So we do have potentially a consignment agreement
19  here and that's certainly what the trustee has been informed
20  from his internal analysis prior to filing this adversary
21  proceeding.

22        And the final thing that's a little bit unique about
23  this case, Your Honor, is that according to St. Jude's own
24  appendix in response to this motion, they did put the debtor on
25  a credit hold.  That I think goes right to one of the facts or

6

1  factors the courts look at for ordinary course matters.
2  Putting the debtor on a credit hold certainly affects what
3  happens with contemporaneous exchange or prepayment or whether
4  antecedent debt, et cetera.

5          All this is to say that the trustee has a legitimate
6  bonafide need for relevant discovery regarding these unknown
7  issues.  In other words, this is not an ordinary preference
8  case where they give us the invoices, they give us the packing
9  slips, they give us whatever contract there might be, they give
10  us bills of lading and then the trustee can figure out, okay,
11  what is the ordinary course, what is the value.

12          This is a case very much where we see how the people
13  on the ground were treating this.  We need to see very much
14  what the actual practice was to see which of these consignment
15  agreements this was.  Your Honor, we've given you an exhibit
16  here, one of their own invoices, I walk you through it, which
17  shows the date of delivery of a heart valve, the date of
18  delivery of the heart valve to the hospital is after the date
19  that that heart valve was implanted into the patient.  That's
20  impossible.  That's impossible that a heart plant -- that a
21  heart valve implanted on May 28th let says was delivered on
22  June 1.

23          So, again, we're not dealing with a black and white
24  simple situation here.  We're dealing with local sales people.
25  We're dealing with local sales people perhaps delivering heart

7

1 valves and stems and other implantables and pacemakers on an
2 as-needed basis because the patient is dying on the table.
3 FedEx doesn't come fast enough to save a patient's life.

4         Again, we need these communications with the sales
5 people. We need whatever contracts govern the relationship
6 with the sales people. We need all communications with the
7 debtor. These are reasonable discovery requests that I humbly
8 submit you would have in any case of any size. And for St.
9 Jude to flat reject those discovery requests is a little bit
10 unprecedented I would suggest.

11         This is not a $20,000 case. This is not a simple
12 case. And this is a case where we're testing the mettle or the
13 merits of their own 503(b)(9) and their own affirmative
14 defenses.

15         I add to that the boilerplate and the generic and the
16 general objections that St. Jude has asserted which dozens and
17 dozens of cases from this court say are improper, and perhaps
18 Your Honor thinks that we're being a stickler on that. Perhaps
19 Your Honor thinks we're being unreasonable, but we're not
20 because counsel and parties hide behind those general and
21 boilerplate objections, so that you never really know what they
22 produced and never really know what they've withheld.

23         And with due respect to St. Jude, in all their
24 communications back to us it's double speak. It's Orwellian
25 double speak. If they have really produced everything that's

St.JudeResponseContemptApp'x.007

WWW.JJCOURT.COM

8

1  responsive that's in their possession, custody and control,

2  then state so in the response to the RFP. That's what this

3  court's precedent requires. If they have withheld a document

4  by category or individually, then state so, so that we know

5  what's been withheld. If they are relying on an objection,

6  then state so, so that the Court today can decide whether that

7  objection is valid. And if they are asserting a privilege,

8  then state so and state what is withheld on the base of

9  privilege and provide a privilege log as necessary. They

10  cannot hide behind boilerplate or general objections.

11      And, finally, Your Honor, it certainly did not

12  prejudice us, but they did get their objections on file or

13  rather to us late and we submit that they've waived any

14  objections that otherwise be valid. Again, I can't tell you

15  that we were prejudiced by that short delay, but they have not

16  sought any relief from that.

17      So, Your Honor, that is the bulk of our case.

18  There's not much more I can say. I'm sure Your Honor has read

19  our moving papers. We're seeking basic minimal discovery here

20  that is targeted and that cannot be overburdensome for a multi

21  billion dollar company like that. Unless Your Honor has any

22  questions, I'll yield the podium.

23      THE COURT: No, I have none. Let me hear from St.

24  Jude.

25      MS. BIALZIK: Good morning, Your Honor. Your Honor,

9

1 we agree that preference cases are typically settled without
2 the need for a trial because parties can evaluate the
3 information and determine whether there are valid defenses.
4 The same is true of a 503(b)(9) case, and in both cases here
5 where we have a 503(b)(9) case that is based on claims of
6 product delivered within the 20-day period and a preference
7 action where the defense is a new value defense, and new value
8 again is based on product that is delivered within the 90-day
9 period that has the value, those are both very straightforward,
10 very routine claims and defenses that can be evaluated off of
11 invoices and proof of delivery.

12       And, Your Honor, St. Jude has provided invoices,
13 proof of delivery, packing slips. Now, we understand that
14 there may be something that the trustee finds confusing on an
15 invoice. For example, he's incorrect in stating that there's a
16 date of delivery that's after the date of the procedure, but
17 there is on the invoice what appears to be a ship date after
18 the date of delivery. We understand how that might be
19 confusing. A targeted interrogatory request could have
20 resolved that because, as we put in the declaration of Richard
21 Genovese, there is an explanation for that, and also Gregory
22 Howett (phonetic). The explanation for that is it's simply a
23 computer function.

24       What happens here in these cases, as Genovese
25 explained, when you have a hand carry delivery, meaning, as Mr.

10

1 Rukavina indicated, that a sales agent is on site at the
2 hospital, usually in the delivery room, and he delivers product
3 to Walnut Hill during the procedure, that is the implant date,
4 that is the delivery date, that is the date of service. That
5 is consistent on all documents we provided.

6       Then the sales agent goes and he enters information
7 into his computer system, and at some shortly thereafter date
8 his computer system uploads information into the St. Jude
9 billing system. The ship date reflects simply the date that
10 the information is transferred from one computer system to
11 another.

12       Now, again, had we had targeted discovery on that
13 kind of a question, we could have produced declarations, which
14 we have now put in the record, and we have offered from the
15 very beginning to provide Mr. Genovese himself and Mr. Howell,
16 if the trustee would like to come to Illinois, to sit for a
17 deposition to explain the procedures, to explain that there was
18 no consignment relationship. There simply is no evidence
19 anywhere of a consignment relationship. Yes, the agreement
20 provided that one could have been set up, but there's no
21 evidence it was set up. We have testimony confirming it was
22 never set up.

23       All of the documentation indicate a delivery date
24 that precedes the date of invoice, and, again, Mr. Genovese is
25 available. And as the Federal Rules of Civil Procedure

StJudeResponseContemptApp'x.01C

WWW.JJCOURT.COM

11

1  explicitly state in 26(b)(2), if there's a less burdensome
2  method for a party to obtain the information it needs, that's
3  what should be pursued.

4          Now, we don't even understand exactly what it is that
5  the trustee thinks that St. Jude should be looking for.  St.
6  Jude has produced all of the records that is has from the
7  places that it knows those records are likely to exist, its
8  computer systems that have billing records and invoice records.
9  It has not searched through archived e-mails to see if there
10 might be some random communication that references Walnut Hill
11 because there's no reason to do that.  We have all the
12 information we need.  It's burdensome.  It's expensive.  The
13 trustee has acknowledged searching archived records is
14 expensive.

15         And the trustee has what it needs.  The trustee could
16 ask Mr. Genovese to sit for a deposition.  Certainly if
17 something came up there that, again, a narrow, targeted reason
18 for some additional discovery requests, that would be
19 appropriate, but this broad fishing expedition is not.

20         And let me be clear, St. Jude is not hiding behind
21 any boilerplate objections.  We have been explicit in phone
22 conversations and in writing that there are no documents that
23 are - or information that is being withheld based on
24 boilerplate objections.  We told the trustee he could deem our
25 responses amended to reflect that, if that's important to him,

12

1  but we are relying solely on specific objections that we've
2  been willing to discuss with the Trustee from the beginning.
3            And, again, we've said, take Mr. Genovese's
4  deposition, get the information you need.  This is
5  straightforward, and we believe that whatever questions he has
6  about the way these invoices look could be answered in a much
7  less burdensome and difficult manner.
8            THE COURT:  All right.  Trustee, response, anything?
9            MR. RUKAVINA:  Yes, Your Honor.  I think counsel's
10 arguments prove exactly why discovery is appropriate here.  She
11 says that there's a consignment contract, but the parties never
12 had a consignment agreement.  She says that there's apparently
13 mistakes with the computer programs that print wrong dates on
14 invoice dates.  This is why communications regarding these
15 matters are critical, so we can test, Your Honor, what counsel
16 says, so we can test what Mr. Genovese says.  Of course we will
17 depose Mr. Genovese, but we should not be required to depose
18 him before we see his own governing contracts and his own
19 communications.
20           All you have to look at, Your Honor, is Exhibit J in
21 our appendix.  This gentleman was implanted with a pacemaker
22 and that Exhibit J expressly says that the date of implant was
23 May 24th, the corresponding invoice says ship date May 31st,
24 invoice date June 12th.
25           Your Honor, with respect to them saying that they're

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 13 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 13 of 39

13

1   withdrawing their general objections or boilerplate objections,

2   that's not what they says in Exhibit G. In Exhibit G in a

3   letter, in a letter, not in a formal response, they say that to

4   the extent you deem our objections and responses revised,

5   accordingly, you can deem them revised by this debtor. Well,

6   Your Honor, serve a clean response to discovery that omits the

7   general and boilerplate objections.

8            And, Your Honor, this is not a fishing expedition.

9   These are targeted discovery requests. We're happy to discuss

10  further narrowings of them, if required, once they get past

11  their general objections. These are not discovery requests

12  that say any and all communications going back years. These

13  are targeted requests for Mr. Genovese's communications and

14  contracts, the other sale person's communications and

15  contracts, and communications going back and forth with the

16  debtor. That's targeted, Your Honor. Thank you.

17           THE COURT: All right. I know you -- all counsel

18  know that judges love discovery disputes. We stay up at night

19  hoping that discovery disputes come in, as I did last night.

20           First of all, the trustee I think pointed this out,

21  but for the benefit of everybody, including the trustee, this

22  is not a hearing on a motion for summary judgment. I am not

23  deciding whether there was, whether there was not a

24  consignment. However, there are enough papers in there that

25  suggest that that is an area of relevance to the inquiry.

14

1    And we're not talking about $75,000 that somebody
2  paid to an auto parts place in the 90 days before bankruptcy.
3  This is big money on both sides.  So I think it justifies a
4  little extra time and attention.

5    Having said that, I would tell the trustee's counsel
6  that, you know, not everybody settles.  You know, if everybody
7  settled, you wouldn't need me and the other people who, you
8  know, get these really nice robes.  So the fact that St. Jude
9  is not rolling over is -- that's really of no import, and I am
10  not viewing anybody's position in this as purely belligerent
11  for the sake of being belligerent.

12    So with those comments in mind, here's the first
13  thing I want to do, I want to go through the general
14  objections.  The trustee has got the better of this, but not
15  entirely.  I won't tell you what I penciled in the margin of
16  my copy of the general response, which was attached to the
17  trustee's appendix, and I'm specifically looking at Document
18  10, which purports to be St. Jude's combined preliminary
19  responses, Exhibit D to the trustee's -- in the trustee's
20  appendix.

21    This puts me in mind of an old railroad lawyers, what
22  we call here general denial, you know, with a -- and the first
23  year associate who simply goes to the Federal Rules and ticks
24  off every single affirmative defense and says, you know, maybe
25  it'll apply, maybe it won't, but what can it hurt to throw it

St.JudeResponseContemptApp'x.014

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 15 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 15 of 39

15

1 in.

2      So you all know how this works.  So we're going to go
3 through this, and the big picture here is that St. Jude is
4 going to have to amend its responses, both with respect to
5 these general objections to make it absolutely clear what's
6 been produced and what is not being produced, and if there is a
7 claim of privilege, St. Jude is going to have to make that
8 claim unambiguously and it's going to have to provide a
9 privilege log to the trustee within a time that we can talk
10 about.  All right.

11      So the general responses objects to the extent they
12 impose any objection, this is Number 1, greater or inconsistent
13 with the Federal Rules of Bankruptcy Procedures and the Federal
14 Rules of Civil Procedure.  You know, that's an objection that
15 is just overbroad.  You can make that objection -- make an
16 objection, if that's an objection, in each response, so that's
17 got to come out.

18      Number 2, you generally object to the extent that the
19 requests are overbroad, not sufficiently particularized.
20 That's humbug too.  You make that objection and response to
21 each discovery request, not a blanket objection.  Once again
22 that's to eliminate any doubt about what is being produced or
23 what is being answered and what is not being answered.

24      Number 3, objection to the extent that they request
25 disclosure of confidential and proprietary information.  That

St.JudeResponseContempt:App'x.015

WWW.JJCOURT.COM

Case 18-03033-bjh Doc 56-1 Filed 10/05/18  Entered 10/05/18 23:58:20  Page 16 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18  Entered 06/25/18 15:44:44  Page 16 of 39

16

1    can be raised in response to each discovery request, no blanket
2    objections.

3         Number 4, the same sort of objection, but this is
4    directed to attorney/client privilege and the work product
5    doctrine, the same thing, you have to urge that a response to
6    each discovery request.

7         I'm not really sure what Number 5 is, but generally
8    discovery is not directed to post-lawsuit communications among
9    the lawyer and the clients.  Those are -- I think the trustee
10   conceded that in his filings, but I don't know why that's
11   necessary to include it, but I don't think it's necessarily
12   appropriate.

13        But I move to six now, it's a general objection on
14   the basis of whether it's discoverable under Rule 26.  You just
15   have to make that in connection with each discovery request
16   rather than a blanket objection.

17        Number 7, objection to the request that -- the
18   request seek documents already in the possession of the debtor
19   or the trustee.  Well, that's an inappropriate objection
20   because it's perfectly permissible to ask for copies of
21   documents.  There may be non-identical copies of documents, and
22   the fact that the trustee or the debtor may already have them
23   it does not necessarily eliminate the probative value of St.
24   Jude's possession of the documents in production of them.
25        The objections to the definitions that instructions

St.JudeResponseContemptApp'x.016

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 17 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 17 of 39

17

1    related -- you know, that's just something you have to make in
2    response to each individual discovery request, although St.
3    Jude is -- rather the trustee has taken a page out of every
4    pattern or discovery request for the past 40 years. Every year
5    they become a little bit more onerous. With the advent of
6    electronic information it became pluperfectly, prismatically
7    onerous.

8         So, all right, now let's go to the -- well, actually
9    Number 10, discovery is continuing, I don't know that you need
10   to include that, and -- because the rules impose a continuing
11   obligation to make discovery.

12        And Number 11 is where you -- where St. Jude sort of
13   creates the problems for itself, but it goes without saying, if
14   the general objections are problematic, then incorporating them
15   into the individual response is even more problematic.

16        So all right, Interrogatory 1, and all these
17   interrogatories and requests for production commence with the
18   phrase subject to the general response.

19        MR. RUKAVINA: Your Honor, we -- not to interrupt the
20   Court, but --

21        THE COURT: Yes.

22        MR. RUKAVINA: -- counsel and I agreed that we don't
23   have a problem with the interrogatories thus far, so certainly
24   if Your Honor wants to comment on them, but  -

25        THE COURT: Okay. No, no, let's go -- let's   I was

18

1  going to say about the interrogatories it's simply the lead in
2  to all of them. It's incorporating general responses.

3       All right. The first set of production, all
4  communications between St. Jude and the debtor that relate to
5  or evidence an agreement to provide goods to the debtor,
6  including documents or communications by which the debtor
7  agreed to same. Okay. St. Jude's objection is that it's
8  overbroad and that it's non-proportional to the needs of the
9  case. Trustee, I -- you contend that that's not appropriate,
10 correct, and that, in fact, it's not overbroad, right?

11      MR. RUKAVINA: Correct, Your Honor.

12      THE COURT: All right. What does St. Jude say?

13      MS. BIALZIK: Your Honor, the term relate to is
14 extremely broad, and any communication that relates to any
15 agreement would cover a myriad of things that are tangential
16 and extraneous. We have provided all of the actual agreements
17 that we have in NOA. We provided the invoice records. I don't
18 know what we would even be searching for if we were to look
19 through archived e-mail records for any reference to Walnut
20 Hill that could be considered relating to their agreement to
21 provide goods. Their entire relationship was an agreement to
22 provide goods.

23      MR. RUKAVINA: Well, but as the --

24      THE COURT: Well, you know, you urge the ordinary
25 course of business actually -- well, you originally urged, and

1  I think your answer that the ordinary course of business was an
2  affirmative defense.  Now, I understand there's correspondence
3  in which you may have abandoned that, but your 50  - your
4  priority claim under 507 and 503 that includes a component of
5  ordinary course of business.

6         So why does that not still keep the communications
7  between St. Jude and Walnut Hill relevant and discoverable
8  within the meaning of Rule 26?

9         MS. BIALZIK:  Well, Your Honor, the 503(b) ordinary
10 course of business is a different ordinary course of business.
11 The ordinary course of business where it's a defense to a
12 preference claim is looking at ordinary course for payment
13 purposes.  And we are not relying on that and if the we need --
14 if the Court needs us to formally withdraw it we can because we
15 have a complete new value defense.

16        In terms of the 20 days, I mean, the evidence is
17 clear that the parties were ordering goods, their medical
18 supplies for the business of the debtor.  There's nothing in
19 there to suggest that this is not part of the debtor's ordinary
20 course of business here.  And so what are we searching for,
21 Your Honor?

22        There's, you know, records that goods were ordered
23 and delivered and I'm not even sure what possibly could exist
24 in some random file or e-mail communication here that relates
25 to this agreement but we've provided enough to show that the

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 20 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 20 of 39

20

1  goods were delivered pursuant to being ordered by a medical
2  facility and their medical products.

3        MR. RUKAVINA:  Well --

4        THE COURT:  The Trustee has said that there was a --
5  the business was winding down by the time -- by the time we
6  were 20 days pre-petition.  I think that's what I understood
7  the Trustee to say.  Is that correct?

8        MR. RUKAVINA:  That's part of what we're saying, Your
9  Honor.  And just to refresh the Court's memory, there is
10 evidence of a consignment.  St. Judge is saying there was no
11 consignment.  So I submit that there's an ambiguity here and
12 the communications leading up to whatever agreements there were
13 or whatever communications might have modified those agreements
14 is absolutely relevant.  Because let's not forget that for a
15 503(b)(9) it's got to be 20 days.  So, what date did title
16 transfer to any goods that may or may not have been shipped?
17 What date were goods ordered when the Hospital ceased
18 operating?

19       THE COURT:  What other documents are there to
20 produce?

21       MR. RUKAVINA:  And, Your Honor, there may not be but
22 I suspect given what we've seen so far in other cases that
23 there's going to be   whoever is the accounting person at St.
24 Judge, and we don't know who that is, there's going to be
25 communications putting the debtor on a credit hold, maybe

21

1 changing the terms of the consignment agreement. There may be,
2 I don't know if there is, negotiations by e-mail leading up to
3 the consignment agreement. There may be communications with
4 the salesman saying hey, we don't have the money to pay for
5 this. Can we pay you for this old invoice or something.

6       I don't know but I don't think it's going to take St.
7 Jude but a little bit of attorney time to go target certain
8 people's e-mails and run certain word searches like Walnut Hill
9 or like Rick Leonard (phonetic) or something like that. And if
10 there's nothing that they can tell us that after a reasonable
11 search they found nothing, no problem.

12      THE COURT: These are all -- St Jude, are these all
13 on electronically accessible database?

14      MS. RUKAVINA: They are archived because St. Jude had
15 a process of expunging e-mails within 30 days. We're not even
16 sure what exactly is in the archives but we know that it is
17 expensive and onerous for us to go and do that search. And the
18 point is that we've offered, again, we've offered testimony
19 from the sales agent who was there who can confirm whether or
20 not -- it's a simple question - either there was consignment
21 inventory or there wasn't. And if he can provide the
22 testimony, an oral testimony that is consistent with the
23 documents, why should St. Jude have to go through the burden of
24 trying to get an IT specialist to come in to figure out what's
25 on the archive.

Case 18-03033-bjh Doc 56-1 Filed 10/05/18   Entered 10/05/18 23:58:20   Page 22 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18   Entered 06/25/18 15:44:44   Page 22 of 39

22

1   The Trustee, in his own papers, has admitted he's

2   not searching the debtor's records which he has archived.   He

3   could look for these same e-mails between the parties talking

4   about the lack of a consignment relationship in the debtor's

5   records and he doesn't want to do it because it's expensive.

6   The same is true for St. Jude and there's no reason for it

7   because we have plenty of evidence and other less burdensome

8   ways for the trustee to ask his questions directly from the

9   sales agent who was responsible.

10          MR. RUKAVINA:   Might I reply, Your Honor?

11          THE COURT:   Yes.

12          MR. RUKAVINA:   Your Honor, the problem with St.

13   Judge's position is that it is their burden evidentially to

14   prove what counsel just said.   And they have not proven

15   whatever burden she alleges there may be.   Now, I represent my

16   law firm all the time.   And de-archiving e-mails is as simple

17   as me sending an e-mail to my IT people saying crack open this

18   archived e mail.   It's   we're not talking about e-mails that

19   are ten years old that are stored off site.   We're talking

20   about a very simple process of de-archiving and, literally,

21   it's the press of a button.   And the reason why we haven't

22   searched all of the debtor's communications is because we don't

23   know where to search.

24          So, it's not true what counsel said that we're just

25   flat refusing to.   We have searched, for example, Rick

1 Leonard's e-mail communications. It's not hard because we know
2 that he's the purchasing manager. But we have something like
3 315 employees. So, for us to go through the 350, because we
4 don't know, we're not the debtor, that is a much, much, much
5 greater burden than for St. Jude to send an e-mail to five or
6 ten employees saying, hey, do you have any communications with
7 the debtor going back -- remember the Hospital was only open
8 for two and a half years. We're not talking about 15 years of
9 communication.

10          THE COURT: All right, now --

11          MS. BIALZIK: Your Honor --

12          MR. RUKAVINA: We are administratively --

13          MS. BIALZIK: Your Honor, employees wouldn't have
14 access to their e-mails. I just said, those e-mails are purged
15 after 30 days so it is an onerous deal of going and getting an
16 IT specialist to go in and look at archived files. I don't
17 even know where those archived -- I don't know where he's
18 getting information about what this process would be but it's
19 not as simple as asking employees to check their own e-mails
20 because those employees don't have access to their own e-mails.

21          MR. RUKAVINA: Your Honor ·

22          THE COURT: Right. But I'm -- okay, let me see if I
23 can save everyone's breath. I'm overruling the objection and
24 I'm going to give St. Jude 14 days to produce the other
25 documents. If I need to be specific, it's archived e-mails and

Case 18-03033-bjh Doc 56-1 Filed 10/05/18  Entered 10/05/18 23:58:20  Page 24 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18  Entered 06/25/18 15:44:44  Page 24 of 39

24

1  if 14 days is unreasonable, I'm amenable to extending that time

2  by motion and I would expect counsel to cooperate on that.  But

3  we're not talking about e-mails from the dawn of the e-mail

4  era.  We're talking about e-mails 14 months ago.  That's not

5  terrible long    15, 16 months ago.

6           So, all right, Request Number 2, all documents and

7  communications within one year before the petition, that

8  details shipments of goods from St. Jude to the debtor

9  identifying the goods shipped, prices, date of shipping and the

10  date the debtor ordered the goods.  Once again the objection

11  that it is overbroad, it is not proportional to the needs of

12  the case it's subject to those general objections and in that

13  objection there were documents produced in response to the

14  first interrogatory.  I would suggest that -- well, let me hear

15  the argument.

16           MR. RUKAVINA:  Your Honor, the argument is the same

17  for Number 3 -- Request Number 2 and Number 3.  I think that

18  St. Jude has produced everything that's responsive so if that's

19  the case then all they have to do is withdraw these general

20  objections and say hey, we produced what's responsive.  If they

21  have not produced what's responsive, then I have further

22  argument.

23           THE COURT:  St. Jude?

24           MS. BIALZIK:  St. Jude has produced everything that

25  we're aware of that's responsive.

25

1          THE COURT:  All right.

2          MR. REKAVINA:  Other than communications, of course.

3          MS. BIALZIK:  Other than communications.

4          THE COURT:  Right and then -

5          MS. BIALZIK:  Yeah, and that's what -- in addition

6 was the communications because, again, we felt like that was

7 overly broad but

8          THE COURT:  Right.  All right.  Well, you've made

9 that argument and I've ruled.

10         Okay.  As to Request 2 and 3, the ruling is to amend

11 the Request to any responses to delete the objections within 14

12 days.

13         All right, Request 4 is communications related to any

14 assertion in the motion, which I assume is a 503(b) motion,

15 including all documents and communications that St. Jude will

16 offer into evidence on any hearing on the motions.  Let me say

17 this to start, I'm not going to direct St. Jude to identify

18 what it's going to use.  I think that impinges on the work

19 product of the attorney.  So, you can't get it that way.  It's

20 easy to take a piggy-back ride on imposing counsel.  I'm not

21 going to make him do that but production of documents relating

22 to facts or assertions in the motion and the objection is, once

23 again, overbroad and not proportional.  And, well, I'll let St.

24 Jude respond.

25         MS. BIALZIK:  Well, again, it    the issue is that

26

1  this communications idea that we were going to have to go
2  search through archived e-mails or anything that might have a
3  reference to something seemed to us overly broad. We've, you
4  know, we've produced the evidence that we have that we intent
5  to rely on. We've offered up the actual people on the ground
6  for deposition and we felt that it was overly broad for us to
7  have to be going and searching through archived e-mails that
8  may or may not even exist at this point.

9        THE COURT: Trustee, anything to add?

10        MR. RUKAVINA: No. I think Your Honor has ruled on
11  that and I hear you loud and clear about getting a sneak peek
12  of their evidence. I hear you on that, Your Honor.

13        THE COURT: Okay. On having said that again, Mr.
14  Rukavina, I'm hearing some difficulty with the signal with
15  hearing what came through.

16        MR. RUKAVINA: I'm sorry, Your Honor. Can you hear
17  me now?

18        THE COURT: Yes, I can.

19        MR. RUKAVINA: What I was saying, Your Honor, was
20  that I think you've already ruled on the communications part of
21  that.

22        THE COURT: Yes.

23        MR. RUKAVINA: And I hear you on the evidence and I
24  understand that you're not going to grant that and that's just
25  fine.

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 27 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 27 of 39

27

1        THE COURT:  Right.  So, I think St. Jude needs to
2   amend its response within 14 days to delete the objections.  I
3   agree that it need only comply with the scheduling order for
4   production of the exhibits it intends to introduce and I don't
5   think I need to make any further ruling on that.

6        Number 5, communications between St. Jude and third-
7   parties related to any demand for payment, claims submitted or
8   payment received by St. Jude against or from such third-party
9   on account of the debtor's failure to pay.  St. Jude said
10  there's no documents.

11       Trustee?

12       MR. RUKAVINA:  If they delete the general objections,
13  then we're happy with their response that there's no documents.

14       THE COURT:  St Jude?

15       MS. BIALZIK:  All right.  We've already stated in
16  writing that we are not withholding anything.  Based on general
17  objections I think we have effectively already done that.  So,
18  I don't think that there's anything that we're fighting about
19  here.

20       THE COURT:  Okay.  So, amend the response within 14
21  days to delete the subject to the general response.  All right.
22  Number 6, documents and communications that support your
23  answers to the interrogatories not otherwise requested in
24  another request.  I don't know that I need to rule on this
25  other than to direct St Jude to amend its response to delete

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 28 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 28 of 39

28

1  the general objections or the objections within 14 days.  Does
2  that make sense to you both?

3        MR. RUKAVINA:  It does to me, Your Honor.

4        MS. BIALZIK:  Yes, Your Honor.

5        THE COURT:  St. Jude?

6        MS. BIALZIK:  Yes, Your Honor.

7        THE COURT:  All right.  Good.  Number 7, different
8  pricing charged different customers.  Trustee, why is this
9  relevant to anything?

10        MR. RUKAVINA:  Well, Your Honor, we did in our
11  response admit that this was a little overbroad and perhaps
12  premature.  It is relevant to the question of value for
13  503(b)(9).  As Your Honor will hear later, we have something
14  like two hundred, three hundred thousand dollars of heart
15  valves that in the last year we have not been able to sell.
16  We're looking to donate them to a hospital in India.

17        Now, this may be premature but let's assume -- and I
18  have no evidence of this    let's assume that St. Jude sells us
19  a heart valve for $20,000 but Baylor, Scott and Wolfe for
20  $10,000?  That would be relevant.  But, again, I concede that
21  this is overly broad and I think that the Court should instruct
22  me to discuss this with opposing counsel within reason once the
23  general and boilerplate objections are removed so we can have a
24  meaningful discussion about this.

25        THE COURT:  St. Jude?

St.JudeResponseContemptApp'x.028

WWW.JJCOURT.COM

Case 18-03033-bjh Doc 56-1 Filed 10/05/18   Entered 10/05/18 23:58:20   Page 29 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18   Entered 06/25/18 15:44:44   Page 29 of 39

29

1          MS. BIALZIK:   Your Honor, we adamantly feel that this
2    is overbroad and is seeking confidential, irrelevant
3    proprietary information.   There is no case law that the Trustee
4    has pointed us to.   We've invited him to find us any case law
5    that would support his idea that pricing that St. Jude may have
6    had with other customers could be relevant to the question of
7    value.   There is case law that we have cited.   The Semcrude
8    case clearly states that the invoice price is the presumptive
9    identification of the value.   He's provided no authority that
10   would suggest that it would be different.

11          And this -- these 503(b)(9) cases, Your Honor, are
12   filed every day.   And every day they are for goods sold.   And
13   if there was some authority that backed the inquiry should be
14   looking at the seller's pricing to other customers negotiated
15   likely on an individual basis to other customers, is relevant
16   or something that the Court should be looking into, there would
17   be case law supporting that.

18          THE COURT:   All right.

19          MS. BIALZIK:   So, I just think this is --

20          THE COURT:   Trustee, final response?

21          MR. RUKAVINA:   The Semcrude case, Your Honor, says
22   that the price charges of presumptive, pardon me, is the
23   presumptive price which can be overcome by the Trustee.   But,
24   again, I can see that as written this is too broad.   And I'd be
25   happy to --

30

1          THE COURT:  Right.  I'm going to sustain the St.

2   Jude's objection to this.  I don't think you're entitled to get

3   into St. Jude's pricing or its relationship with third-parties.

4   I think that is classic proprietary information.  And let's

5   move now to the second set of requests for production.

6          Number 1 is -- I'm paraphrasing here

7   communications between St. Jude and Richard Genovese including

8   Richard Genovese, Jr., mentioning Walnut Hill, including

9   invoices and other documents.  And the response is overbroad,

10  not proportional to the needs of the case.

11         Trustee?

12         MR. RUKAVINA:  Your Honor, request 1 through 8 are

13  substantially the same.  These are people we believe, from the

14  invoices, that were salesman or people who delivered the

15  physical goods.  And primarily the issues here relate to

16  communications, which I think Your Honor has already ruled on.

17  Also we are requesting any contracts that St. Jude might have

18  with these salesmen.

19         Now, St. Jude says that these are employees so there

20  may very well not be any contracts buying if that's the

21  response.  But if they are third-party sales people, then

22  whether they have any contracts is relevant.  For example, when

23  and how and under what circumstances did they release a heart

24  valve to the debtor?

25         So, all of these 1 through 8 just go to what we've

31

1 already discussed, which is what was the actual practice on the
2 ground, consignment or not, with respect to how and when the
3 debtor ordered a part and how and when St. Jude provided that
4 part and how and when the debtor was to pay for that part.

5          THE COURT: All right. Well, this is broader than
6 contracts.

7          St. Jude?

8          MS. BIALZIK: Yeah. Your Honor, our issue with this
9 was not simply the burden of searching archived e-mails. It's
10 also that it's extremely broad. It's talking about any
11 communications that relate to or mention the debtor. This
12 would include everything that he might have about his sales
13 territories, his compensation. And he may well have employment
14 agreements that talk about his own compensation or benefits or
15 how he has a sales strategy.

16          I don't see how any of this has to do -- particularly
17 with this limited question of whether there was a consignment
18 inventory. We can look for some e-mail communications -- we've
19 already said we're going to do that -- but beyond that, if it's
20 not an e-mail communication that's directly talking about
21 something relating to this consignment theory, I don't see how
22 this has any relevance, particularly because they can take his
23 deposition.

24          And I'd also like to point out that these are -- 1
25 through 8 -- essentially the same request but only this first

Case 18-03033-bjh Doc 56-1 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 32 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 32 of 39

32

1 one, Richard Genovese, goes to a sales agent who was involved

2 in the Hand Carry (phonetic) business. The rest are sales

3 agents who happened to be mentioned on FedEX. And my

4 understanding is there's no suggestion that FedEx inventory

5 could have been consignment. It's clearly delivered by FedEx.

6 So, after Mr. Genovese there's no reason that any of these

7 sales agents have any relevance to anything.

8           MR. RUKAVIN: But, Your Honor

9           THE COURT: But the fact that it's FedEx doesn't

10 preclude a consignment arrangement, I think. You could FedEx

11 something in the hospital and they can put it on the shelf in

12 the supply room, they keep it for the next procedure. But --

13           MS. BIALZIK: But they bill for it, Your Honor.

14           THE COURT: -- be that as it may --

15           MS. BIALZIK: But they bill for it immediately. So

16 then it's not a consignment because it's paid for immediately,

17 which means it's not something where it's sent by FedEx and

18 held until some later date. It's billed for contemporaneously

19 with FedEx. So there's no way that that could be part of some

20 sort of consignment inventory.

21           MR. RUKAVINA: Your Honor, this is part of what we

22 attempted to discuss during our discovery conference dispute

23 call. What the Trustee wants, only, are communications that

24 mention the debtor and only any contracts that govern Mr.

25 Genovese's or these other salesmen's deliveries and releases.

1  We don't want employment files.  We don't want disciplinary

2  files.  We don't want tax files.  We don't care about other

3  hospitals.

4          So, what we want are communications that mention the

5  debtor, which I think Your Honor has covered and then

6  contracts, if any, and there may very well not be that -- where

7  St. Jude tells Mr. Genovese or these other people, okay, here

8  is when, how and why you release a particular good to the

9  debtor.

10          THE COURT:  All right.  Let me see if I can parse

11  this.  You're satisfied with my order with regard to

12  communications that that is broad enough to cover

13  communications that these employees concerning Walnut Hill,

14  correct?

15          MR. RUKAVINA:  Absolutely, Your Honor.  Yes.

16          THE COURT:  All right.  Now, let's go to employment

17  contracts.  St. Jude, do these contracts, assuming there are

18  contracts, I happen to know not with St. Jude but other medical

19  supply businesses, that there are, if there -- even if there's

20  an employee relationship, there is a contract governing that

21  relationship.  Do those contracts with St. Jude   address

22  delivery of product to hospitals in any way that would touch on

23  any of the issues here?

24          MS. BIALZIK:  Your Honor, we asked St. Jude and they

25  indicated that they don't have some sort of global employment

St.JudeResponseContemptApp'x.0333

Case 18-03033-bjh Doc 56-1 Filed 10/05/18   Entered 10/05/18 23:58:20   Page 34 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18   Entered 06/25/18 15:44:44   Page 34 of 39

34

1    contract that would touch on this.  What they might have are

2    agreements regarding compensation or benefits.  But the don't

3    have a contract with these sales agents that governs the manner

4    in which they perform their job and is what we've been told by

5    St. Jude.

6            MR. RUKAVINA:  And, Your Honor, we would take that as

7    a response to this discovery request if that is, in fact, the

8    case.  No problem.

9            THE COURT:  All right.  So, let's do this.  To

10   eliminate any ambiguity, and I know you know that if some

11   document turns up later one, it's not going to reflect well on

12   the parties, so, you can amend your responses to Request 1

13   through N, I guess "N" being 9, the second set of requests for

14   production to remove the general objections and the others

15   directed to breadth of discovery and the burdensome nature of

16   the discovery to specify that there are no contracts, right?

17   And I think my ruling on communications in the first set of

18   requests addresses everything else.  So, if we have to tweak

19   these responses to reflect that, I think that covers it.

20           Now, what are we left now?

21           MR. RUKAVINA:  I think we're left with Number 9,

22   Your Honor just ruled on Number 9    I don't know if you

23   intended to or not.  Number 9 is really cumulative of

24   everything else we've discussed today.

25           THE COURT:  Oh.  Yes.  I'm sorry.  I thought Number 9

35

1  was in light of our argument -- Number 9 was yet another
2  employee.

3            MR. RUKAVINA:  It's just --

4            THE COURT:  Okay.

5            MR. RUKAVINA:  -- cumulative of everything else.  So
6  I think if the Court has ruled on communications and I think if
7  St. Jude responds that there are no contracts other than been
8  produced, then I think we're fine.

9            THE COURT:  Right.  I think Request Number 9 is
10 cumulative so I'm going to sustain St. Jude's objection to
11 request Number 9 as cumulative.

12           Is that explicit enough for everyone?

13           MR. RUKAVINA:  It is for the Trustee, Your Honor.
14 The last thing we had was we have requested reasonable
15 attorney's fees.

16           THE COURT:  Right.  I'm not going to award attorney's
17 fees.  I think that St. Jude made it's objections in good faith
18 and both of you are coming before a new judge for the first
19 time.  So, I think this is   passionate advocacy is a good
20 thing.  I think that maybe we got a little bit out of hand on
21 this.  I don't think that -  I think there's more heat than
22 light generated in this dispute.  All right?  Let me put it
23 that way for the scientists among you.

24           So, I'm not going to award attorney's fees but I
25 would prefer not to see a motion like this again.  So please

St.JudeResponseContemptApp'x.033