Case 18-03033-bjh Doc 56-2 Filed 10/05/18 Entered 10/05/18 23:58:20 Page 1 of 35
Case 18-03033-bjh Doc 22 Filed 06/25/18 Entered 06/25/18 15:44:44 Page 36 of 39

36

1  try to resolve them. I'm available if we have to have

2  discovery disputes adjudicated but it's not in the client's

3  best interest, okay?

4     MR. RUKAVINA: And, Your Honor, are we to propose an

5  order or is the Court going to prepare one?

6     THE COURT: Please propose an order. Collaborate.

7  Agree on the terms of the order. If you have any questions,

8  call chambers speak to the law clerks and they'll bring it to

9  me. All right?

10     MR. RUKAVINA: Thank you, Your Honor.

11     MS. BIALZIK: Your Honor, we have one more matter

12  here because obviously we're going to be undertaking some

13  additional discovery responses here. And as far as I could

14  tell, there was nothing in the scheduling order in this case

15  that had a mandatory mediation. We believe this would be an

16  appropriate case for such a mediation and so we're wondering if

17  the Court would consider -- which may require us altering the

18  current scheduling order set out. For example, the summary

19  judgment deadline so that we could get a mediation done. Once

20  we get this discovery done we feel this is a case that would be

21  appropriate for that.

22     MR. RUKAVINA: Well, Your Honor -

23     THE COURT: Trustee?

24     MR. RUKAVINA: We are going to have to amend the

25  scheduling order because we're supposed to go to trial in

St.JudeResponseContemptAppx.035

37

1  September. I don't think there's any way we're going to be
2  ready for a trial September, given the four month delay on
3  discovery. The Trustee is against mandatory mediation. I
4  think the practice in this district is that the judges do not
5  order it. But that being said, the Trustee will always
6  reasonably consider a mediation proposal when and if he thinks
7  that he's ready to sit down and have a meaningful discussion.

8          THE COURT: St. Jude, let me suggest this. Why don't
9  you all take a look at whatever else is coming out through the
10 production as a result of today's hearing. If anything, my
11 personal practice is that I do not order mediation unless all
12 the players agree to mediation. I think, other than that, it's
13 -- we're forcing people to do something that they really have
14 no obligation to do when they have a judge who can decide a
15 case for them. But after the Trustee reviews whatever else
16 comes out, if cooler heads prevail, if the parties want to
17 mediate, I'm amenable to further adjustment of the trial
18 schedule to allow that to go forward if it would save everybody
19 money.

20         But in the meantime, what I would encourage you all
21 to do is to discuss reasonable settlement of any of these
22 issues. You know, I'm not afraid to try it. Judge Houser is
23 going to be around -- she's not afraid to try these things.
24 But the worst settlement is better than the best lawsuit. And
25 you can put that on my tombstone. Share that with your

St.JudeResponseContemptAppx.037

WWW.J3COURT.COM

38

1  colleagues, you know? They'll disagree but, you know, that's

2  what -- that's where you get the money to build stadiums at law

3  schools and    anyway.

4          Okay. Anything else lady, gentlemen?

5          MS. BIALZIK: One more thing, Your Honor.

6          THE COURT: Yes?

7          MS. BIALZIK: We absolutely understand that but as

8  Mr. Rukavina just mentioned, with this additional discovery, I

9  think we may have to set some new dates in the scheduling order

10 and we're all here.  I mean, I -- certainly if the Court

11 doesn't want to do that right now but it just seems to me we're

12 all in the courtroom should we figure out some new dates?

13         MR. RUKAVINA: Well, I think we should get the

14 courtroom deputy and propose their own scheduling order, Judge.

15         MS. BIALZIK: That's a good idea.

16         THE COURT: That's what my suggestion is, as well.

17         MS. BIALZIK: Okay.

18         THE COURT: I don't have your scheduling order in

19 front of me. I didn't tinker with the original scheduling

20 order. I'll be happy to get involved if you can't reach an

21 agreement. But if you would speak to Ms. Harden the courtroom

22 deputy you can come up with a schedule. She'll call me and ask

23 me for my input if it's necessary and -- but I think it's a

24 good suggestion. Do it while you're there if you can get her.

25 She's downstairs, I think. If she could accommodate you. This

39

1   would be a good time to do it while you're all in the building.

2   All right?

3           MS. BIALZIK:   Right.   Thank you, Your Honor.

4           MR. RUKAVINA:   Thank you, Your Honor.

5           THE COURT:   Thanks, folks.

6                        * * * * *

7           **C E R T I F I C A T I O N**

8           We, COLETTE MEHESKI and ALYCE H. STINE, court

9   approved transcribers, certify that the foregoing is a

10  correct transcript from the official electronic sound

11  recording of the proceedings in the above-entitled matter,

12  and to the best of our ability.

13

14  /s/ Colette Meheski

15  COLETTE MEHESKI

16

17  /s/ Alyce H. Stine

18  ALYCE H. STINE

19  J&J COURT TRANSCRIBERS, INC.         DATE: June 22, 2018

20

21

22

23

24

25

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| WALNUT HILL PHYSICIANS' | ) | Bankruptcy: 17-32255-bjh7 |
| HOSPITAL, LLC, | ) | |
| | ) | |
| Debtor in Liquidation. | ) | |

| | | |
|---|---|---|
| SCOTT M. SEIDEL, CHAPTER | ) | |
| 7 TRUSTEE, | ) | |
| | ) | Adversary: 18-03033-bjh |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ST. JUDE MEDICAL, S.C., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF SAMUEL C. WISOTZKEY

Samuel C. Wisotzkey makes the following declaration under penalty of perjury.

1.     I am an attorney with Kohner, Mann & Kailas, S.C., lead attorneys for defendant St. Jude Medical, S.C. Inc. ("St Jude"). The information stated herein is true and correct to the best of my knowledge, information and belief.

2.     I attended the hearing in this matter on June 21, 2018 in which the court heard argument on the Trustee's first motion to compel. My understanding from the hearing and of the court's ruling was that the court ordered St. Jude to search for and produce (a) emails, if any, reflecting communications between St. Jude and the identified sales people regarding the delivery of goods, (b) emails, if any, reflecting communications

between St. Jude and Walnut Hill; and (c) any agreements between St. Jude and its salespeople.

3. Immediately after the June 21 hearing, I communicated with St Jude verbally and in writing about the need to conduct searches required by the Court.

4. Consistent with the Trustee's counsel's representations at the hearing, St. Jude searched for email communications of the four identified sales people (including Richard Genovese, Jr.) plus three credit department individuals who were involved with Walnut Hill and thus might have had email communications: Gregory Haut, Jack Barton, and June Alverez-Fetzer. The search terms that were used were: "Walnut Hill," "Rick Leonard," "Richard Leonard," "Keandrea Epps," "Keandrea." and "rickleonard*" and the date range from June 1, 2016 to July 1, 2017.

5. We revised and re-issued St Jude's written discovery responses and served those responses on July 5, 2018, in accordance with the Court's ruling at the June 21 hearing. As for emails, only very few responsive emails were located, and those documents were produced to the Trustee on July 9, 2018. We further confirmed that there were no agreements with salespeople to produce. At this point, we believed St Jude had fully complied with the Trustee's first two discovery requests and the court order arising from the June 21 hearing.

6. As explained in my July 10 letter to the Trustee's counsel, while we believed St Jude had conducted reasonable searches and produced responsive documents, we indicated that St. Jude was willing to consider other reasonable search terms, and search emails of other employees, if those employees were likely to have had communications with Walnut Hill, but that we could provide no assurances that any additional records

StJudeResponseContemptAppx.041

2

would be found. At the same time, given that counsel had represented that they had all of Mr. Leonard's emails, we invited him to produce those records voluntarily in the hope that they could narrow the issues.

7. The Trustee did not respond for more than 2 weeks. During this time, there was no further suggestion that St. Jude had violated the Court's June 21 Order or had otherwise failed to comply with the same.

8. The Trustee's counsel finally responded on July 25, 2018. Among other assertions, the Trustee now asserted that St. Jude was obligated to undertake significant additional searches and investigations. St. Jude considered those directives far outside the scope of the original discovery requests, the Court's order, or the searches the Trustee had indicated would be acceptable at the June 21 hearing.

9. The Trustee's July 25 letter asked for a further response by August 3, 2018. On August 3, 2018, my partner Melinda Bialzik wrote back to the Trustee's counsel. As reflected in that letter, we categorically reject the Trustee's assertions about lack of compliance with the Court's order on the motion to compel, and did so specifically on the basis of several references to the hearing transcript from the June 21 2018 hearing.

10. Notwithstanding St. Jude's position that it had fully complied with the Court's order, St. Jude still sought to conciliate further. St. Jude specifically identified three possible additional employees it might search, by name: Mark Sorensen, John Grimsley and Mark Todryk for communications about the sale or delivery of goods. Although the Trustee never responded to the August 3 letter, St. Jude did conduct the additional searches of these three employees email records, but those searches did not locate any additional responsive documents.

St.JudeResponseContempsAppx.042

3

11.     After the August 3 letter, there was no further communication from the Trustee regarding discovery obligations for more than three (3) weeks, although the parties did communicate to select a new date for trial docket call. In fact, the Trustee only sought to communicate about discovery obligations after counsel for St. Jude contacted counsel for the Trustee to advise that St. Jude intended to file a motion to amend its pleadings, withdrawing both its § 503(b)(9) claim and its ordinary course defense to the preference action, a motion for summary judgment on the narrow remaining issue of its new value defense, and seek a protective order from further discovery.

12.     Further, despite the fact that St. Jude cited at length to the transcript from the June 21 hearing to support its positions in its August 3 letter, the Trustee's counsel apparently did not have and did not seek to review that transcript until after St. Jude indicated it would be moving for a protective order and for summary judgment. Attached hereto as Exhibit A is a copy of the September 4, 2018 email from the Trustee's counsel requesting St. Jude provide a copy of the transcript referenced in its August 3, 2018 letter. St. Jude provided the transcript to the Trustee, at no charge, later that same day.

13.     The Trustee and St. Jude's counsel had a further call regarding discovery conciliation on September 5, 2018. A transcript of that call is attached hereto as Exhibit B.

Dated: October 5, 2018.

Samuel C. Wisotzkey

St.JudeResponseContemptApp'x.048

4

| | | |
|---|---|---|
| **From:** | Vasek, Julian | |
| **To:** | Samuel C. Wisotzkey; Melissa A. Baker; "Tom Johnson" | **Exhibit "A"** |
| **Cc:** | Gutierrez, Beatriz | |
| **Subject:** | Discovery Conference | |
| **Date:** | Tuesday, September 4, 2018 11:04:12 AM | |

Counsel:

Will you please send me a copy of the transcript referenced in your August 3 letter as soon as possible? Please also provide some alternative times this afternoon or tomorrow morning when we can discuss this matter by telephone.

Thanks,

Julian P. Vasek

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800 / Dallas, Texas 75201-6659

Direct: +1.214.855.7528 / jvasek@m...cch.com / munsch.com

Notice: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. Nothing contained in this message or in any attachment shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

Transcription of a Telephone Call - September 5, 2018

1    IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                DALLAS DIVISION

3    In re:                          ) Chapter 7   Exhibit "B"
                                     )
4    WALNUT HILL PHYSICIANS'         ) Bankruptcy: 17-32255-bjh7
     HOSPITAL, LLC,                  )
5                                    )
          Debtor in Liquidation.     )
6    ─────────────────────────────────

7    SCOTT M. SEIDEL, CHAPTER        )
     7 TRUSTEE,                      )
8                                    ) Adversary: 18-03033-bjh
          Plaintiff,                 )
9                                    )
          v.                         )
10                                   )
     ST. JUDE MEDICAL S.C., INC.,    )
11                                   )
          Defendant.                 )
12

13

14

15            TRANSCRIPTION OF A TELEPHONE CALL

16                 SEPTEMBER 5, 2018

17

18

19

20            The following proceedings of a telephone call

21    were taken in the above-styled and numbered cause on

22    September 5, 2018, from 10:05 a.m. to 10:51 a.m., before

23    Adrianne Harris, Certified Shorthand Reporter in and for

24    the State of Texas, at the offices of Padfield & Stout,

25    L.L.P., 705 Ross Avenue, Dallas, Texas.

Transcription of a Telephone Call - September 5, 2018

1                         APPEARANCES

2   FOR PLAINTIFF:

3         Mr. Julian P. Vasek (via telephone)
          MUNSCH HARDT KOPF & HARR, P.C.
4         500 North Akard Street
          Suite 3800
5         Dallas, Texas  75201-6659
          Phone: (214)855-7528
6         Fax: (214)855-7584
          Email: jvasek@munsch.com
7

8   FOR DEFENDANT:

9         Ms. Malinda A. Bialzik (via telephone)
          Mr. Samuel C. Wisotzkey (via telephone)
10        KOHNER, MANN & KAILAS, S.C.
          Washington Building
11        Barnabas Business Center
          4650 North Port Washington Road
12        Milwaukee, Wisconsin  53212-1059
          Phone: (414)962-5110
13        Fax: (414)962-8725
          Email: mbialzik@kmksc.com
14                swisotzkey@kmksc.com

15        - and -

16        Mr. John E. Johnson
          PADFIELD & STOUT, L.L.P.
17        705 Ross Avenue
          Dallas, Texas  75202
18        Phone: (214)215-6402
          Fax: (817)338-1610
19        Email: jjohnson@padfieldstout.com

20

21

22

23

24

25

3

Transcription of a Telephone Call - September 5, 2018

1        P R O C E E D I N G S

10:05 2          MS. BIALZIK: All right. So, Julian, if you

10:05 3   want to go ahead.

10:05 4          MR. VASEK: Melinda, I mean, we're having this

10:05 5   call, you know, to discuss some ongoing discovery

10:05 6   disputes. We're required to have it under the Rules and

10:05 7   under our local Dondi opinion, and I'm hoping maybe we

10:05 8   can work something out with, given where everything is,

10:05 9   the Motion for Protective Order and everything.

10:05 10         There may not be much wiggle room without

10:05 11  getting the Court involved, but that's what we're here

10:05 12  to find out.

10:05 13         MS. BIALZIK: Okay.

10:05 14         MR. VASEK: So, you know, we sent a letter on

10:05 15  July 25th in response to a letter from you guys where

10:05 16  you had requested additional search parameters. We

10:06 17  suggested some. You obviously believe that they are too

10:06 18  broad, but, you know, we never heard an alternate

10:06 19  proposal. So I don't know if you guys have one.

10:06 20         MS. BIALZIK: Well, we sent you the letter on

10:06 21  August 3rd, and obviously you got that, but our -- and

10:06 22  our feeling is, at that point, there's one or two -- I

10:06 23  think we had one or two additional people who we thought

10:06 24  might have some general communications with Walnut Hill,

10:06 25  but then we opted to change the landscape and withdraw

Transcription of a Telephone Call - September 5, 2018

10:06 1    the ordinary course issues entirely from the case.

10:06 2        And since we'd already produced all of the

10:06 3    communications with the actual salespeople involved, and

10:06 4    in particular with Mr. Genovese, who is the most

10:06 5    knowledgeable and the on-the-ground person, at this

10:06 6    point we don't see that any additional discovery is

10:06 7    warranted, which is what we set forth in our motion.

10:06 8        MR. VASEK: Right. And I guess our position

10:06 9    is, you know, from our perspective, it feels like we've

10:07 10   been hand-fed selective evidence that supports the

10:07 11   defense and that we've -- denied access to anything

10:07 12   else.

10:07 13       And we just can't -- I mean, we can't evaluate

10:07 14   the whole situation without seeing all of the evidence;

10:07 15   in particular, email communications where they might've

10:07 16   been talking about -- and I know we're now down to the

10:07 17   principal issue being consignment based on the withdraw

10:07 18   of the ordinary course defense, but, you know, I don't

10:07 19   know if their internal email's discussing a consignment

10:07 20   relationship. I don't know if there are, you know,

10:07 21   emails with third parties --

22                     (Simultaneous speaking.)

10:07 23       MS. BIALZIK: I'm sorry. Go ahead.

10:07 24       MR. VASEK: Oh, no. Go ahead.

10:07 25       MS. BIALZIK: Well, I was going to say, I mean,

5

Transcription of a Telephone Call - September 5, 2018

10:07 1  the Court ordered us to look for, you know, the

10:07 2  communications, the email -- aren't there emails between

10:07 3  the parties, is what we were talking about with the

10:07 4  Court, and in particular, you know, the representations

10:07 5  Davor made; and he was looking for communications with

10:07 6  the on-the-ground salespeople.

10:07 7       But the reality is -- I mean, we searched the

10:07 8  email boxes of these sales representatives, and we

10:08 9  didn't limit our search to something that might've been

10:08 10  exchanged with Walnut Hill. We -- anything that

10:08 11  referenced Walnut Hill, that was one of our search

10:08 12  terms.

10:08 13       So, you know, we've explained to you that --

10:08 14  and we've explained to you before you brought the Motion

10:08 15  to Compel that there's a very tight search policy and

10:08 16  that the emails simply don't exist, and, you know, we

10:08 17  can't produce emails we don't have; and if you -- if you

10:08 18  believe there might be some communications between the

10:08 19  parties, you know, you have access to those, but we've

10:08 20  produced what we have.

10:08 21       And it seems to me that even in searching

10:08 22  whatever you have, you're not finding any emails that

10:08 23  suggest in any way, shape or form that there was

10:08 24  actually consignment goods on site. So there's really

10:08 25  no basis to think that there was if you can't find

Transcription of a Telephone Call - September 5, 2018

10:08  1    anything in your records, either.

10:08  2            So we're not really sure where -- you know,

10:08  3    what you think there is, but if you can't find anything

10:09  4    in your records and we've produced what we have, we're

10:08  5    not sure what else we can do here.

10:08  6            MR. VASEK:  Well, I mean, again, the problem is

10:08  7    we've only de-archived a handful, and, you know, we

10:08  8    don't have people who do that.  I'm confident that

10:08  9    Abbott, the, you know, I think No. 111 on the Fortune

10:08 10    500, have got to have people who can do this at not

10:09 11    actual cost, salaried people who can do it.

10:09 12            MS. BIALZIK:  Well, it's not about the cost.

10:09 13    It's about the fact that they -- you know, they didn't

10:09 14    archive.  They don't have the emails.  We -- you know,

10:09 15    we've produced to you what we have.

10:09 16            MR. VASEK:  Well, actually, that's another

10:09 17    thing I'd like to talk about because we haven't -- I

10:09 18    mean, we've gotten letters from you that say they're

10:09 19    purged from an inbox and different items folder.  We've

10:09 20    had a letter that said they're not preserved, but, you

10:09 21    know, the fact that something's purged from an inbox

10:09 22    doesn't necessarily mean that there's no copy of it

10:09 23    somewhere else.

10:09 24            So one thing we've been struggling with is we

10:09 25    haven't gotten, like, a clear, unequivocal statement

Transcription of a Telephone Call - September 5, 2018

| | | |
|---|---|---|
| 10:09 | 1 | that the emails are gone, that they're nowhere, they |
| 10:09 | 2 | don't exist anywhere in any form; and, you know -- |
| 10:09 | 3 | MS. BIALZIK: Well, I think our -- this set |
| 10:09 | 4 | that out in the August 3rd letter that, you know -- that |
| 10:09 | 5 | they don't have -- you know, that at some point -- and |
| 10:09 | 6 | I'm just looking at what exactly we said. You know, |
| 10:10 | 7 | emails are purged. There is no backup. |
| 10:10 | 8 | There -- at some point in time they had a |
| 10:10 | 9 | backup that was solely for disaster recovery purposes. |
| 10:10 | 10 | So it was not a long-term backup, and they don't have |
| 10:10 | 11 | that anymore, either. |
| 10:10 | 12 | MR. VASEK: Right. But did they destroy it? |
| 10:10 | 13 | Did they lose it? I mean -- you know, the problem is, |
| 10:10 | 14 | it seems to us we could -- from our view, a 30-day |
| 10:10 | 15 | policy is crazy. I mean, it doesn't make any sense. |
| 10:10 | 16 | You've got this, again, No. 111 on the Fortune 500. |
| 10:10 | 17 | I did a quick PACER search the other day. |
| 10:10 | 18 | Abbott gets sued literally almost every day in Federal |
| 10:10 | 19 | Court. I think if you were able to form a similar |
| 10:10 | 20 | search across State Courts, you'd probably find that |
| 10:10 | 21 | Abbott does get sued every single day for something or |
| 10:10 | 22 | another. This -- |
| 10:10 | 23 | MS. BIALZIK: They make a business decision on |
| 10:10 | 24 | their purge policy, and, I mean, the case law's very |
| 10:10 | 25 | clear that as long as it's a consistent policy, there |

Transcription of a Telephone Call - September 5, 2018

10:10 1   were -- and maybe, you know, they take the rest of it

10:10 2   and maybe it couldn't go to emails for something --

10:10 3   could be lost; but they can't anticipate all the

10:11 4   litigation that may come years down, and it's their

10:11 5   business policy.

10:11 6          But the key thing here is that you have all of

10:11 7   Rick Leonard's emails.  He was the point-of-contact

10:11 8   person.  You also said that you have all of Genovese's

10:11 9   emails with the debtor, and he was the on-ground person;

10:11 10  and if you have --

10:11 11          MR. VASEK:  No, we --

10:11 12          MS. BIALZIK:  -- all of those and there's

10:11 13  nothing in there that supports the existence of

10:11 14  consignment inventory ...

10:11 15          MR. VASEK:  I don't know that we have all of

10:11 16  Genovese's emails.  I mean, we have, perhaps, his emails

10:11 17  with the individuals who's accounted with the archives,

10:11 18  but, you know, we don't have just all Genovese emails;

10:11 19  and that's one thing we'd like to see.  I mean, guys,

10:11 20  we've got a contract that says this is a consignment

10:11 21  relationship.

10:11 22          MS. BIALZIK:  It does not.  It says the parties

10:11 23  have the ability --

10:11 24          MR. VASEK:  Well --

10:11 25          MS. BIALZIK:  -- if they want, to create a

Transcription of a Telephone Call - September 5, 2018

10:11 1   consignment inventory; but there's no evidence anywhere

10:11 2   that they ever did it. And we -- and it -- we still --

10:11 3   despite our Motion for Protective Order, we still would

10:11 4   be willing to produce Mr. Genovese, himself, if that

10:11 5   would be helpful to you, for a deposition, because we

10:12 6   don't have --

10:12 7        MR. VASEK: We can't take his deposition

10:12 8   without looking at all of the emails and the

10:12 9   communications. I mean, you've got to have exhibits to

10:12 10   take into a deposition. That's not -- that's not

10:12 11   reasonable.

10:12 12        MS. BIALZIK: If he testifies there's no

10:12 13   consignment and you have all of his emails with his

10:12 14   contact people at Walnut Hill and there's no discussion

10:12 15   of any consignment inventory anywhere and he can explain

10:12 16   all of the invoices and the fact that they were good

10:12 17   that he was delivering that were not earmarked, there's

10:12 18   really just nothing left that could be even -- I

10:12 19   don't -- I mean, there's nothing left.

10:12 20        You've got all the facts you need, and so I

10:12 21   just don't see where --

10:12 22        MR. VASEK: No, but we -- but we don't. We

10:12 23   want -- we want to test the evidence provided. We want

10:12 24   to test his testimony, if there's going to be a

10:12 25   deposition, against something he might've said in an

Transcription of a Telephone Call - September 5, 2018

| | | |
|---|---|---|
| 10:12 | 1 | email or against something that one of his colleagues |
| 10:12 | 2 | might have said in an email. I -- that's -- |
| | 3 | (Simultaneous speaking.) |
| 10:12 | 4 | MS. BIALZIK: -- the identified salespeople, |
| 10:12 | 5 | and Davor specifically said the on-the-ground people. |
| 10:12 | 6 | We searched email of Genovese and the others identified, |
| 10:13 | 7 | and we provided what we have. So -- |
| 10:13 | 8 | MR. VASEK: I have read the transcript. Thank |
| 10:13 | 9 | you, by the way, for sending it, and I don't agree that |
| 10:13 | 10 | it's limited to two things. Furthermore, we negotiated |
| 10:13 | 11 | an agreed order embodying the terms of the -- of the |
| 10:13 | 12 | Court's ruling, and there are no limitations in that |
| 10:13 | 13 | order. I mean, the -- |
| | 14 | (Simultaneous speaking.) |
| 10:13 | 15 | MR. VASEK: -- objections have been overruled. |
| 10:13 | 16 | He found that it's not burdensome for St. Jude to |
| 10:13 | 17 | conduct this search. I mean, you can't -- |
| | 18 | (Simultaneous speaking.) |
| 10:13 | 19 | MS. BIALZIK: -- on the record. He's asked the |
| 10:13 | 20 | search we were talking about, and he was very clear |
| 10:13 | 21 | about what he was ordering, and he set up a time. We |
| 10:13 | 22 | don't know that anything exists. We searched. We |
| 10:13 | 23 | searched Genovese. We searched the other salespeople |
| 10:13 | 24 | identified. We searched with broad terms anything |
| 10:13 | 25 | referencing Walnut Hill. We've provided what we have. |

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com TXCSRgmailResponseXion.emplAppyx054

Transcription of a Telephone Call - September 5, 2018

10:13 1       And so, you know, we can't -- we can't provide

10:13 2 documents that don't exist; and to the extent that you

10:13 3 think that there might be communications between the

10:13 4 parties, you're just going to have to go back to your

10:13 5 own document source for that, and we don't think that

10:13 6 there is anything in there.

10:13 7       You certainly are welcome to search your own

10:14 8 documents and confirm that there's nothing there, but we

10:14 9 can't provide documents we don't have; and, frankly,

10:14 10 there's no reasonable basis for you to continue pushing

10:14 11 on this when the evidence is very consistent and clear

10:14 12 that you do have that there was no consignment

10:14 13 inventory.

10:14 14     MR. VASEK:  Well --

15           (Simultaneous speaking.)

10:14 16     MR. VASEK:  That is self-serving, hand-selected

10:14 17 evidence.  We want to see what people were saying

10:14 18 contemporaneously with these transactions.

10:14 19     MS. BIALZIK:  But based on what, Julian?  I

10:14 20 mean, you don't even have a sworn statement from

10:14 21 somebody at Walnut Hill saying there absolutely was

10:14 22 consignment inventory.

10:14 23     All we have is Davor said that he was told

10:14 24 there might have been either a consignment inventory or

10:14 25 hand-carry.  We've confirmed that it was hand-carry.

Transcription of a Telephone Call - September 5, 2018

10:14 1  We've explained what that is, a sworn declaration under

10:14 2  oath from our person explaining what was happening.

10:14 3  Summary Judgment is in front of the Court, and we've --

10:14 4  I mean, it's -- you have it. So --

10:15 5       MR. VASEK: Well, we have a disagreement about

10:15 6  how to interpret this contract. It says, for the term

10:15 7  of this agreement, St. Jude agrees to provide part CRN

10:15 8  products to the debtor on consignment. That's not

10:15 9  optional to me.

10:15 10      MS. BIALZIK: It does -- what it says -- and

10:15 11  let's pull the contract out. The contract says that the

10:15 12  parties can create a consignment inventory, but they

10:15 13  have to agree to it and it's got to be set out.

10:15 14      And you don't have a shred of evidence -- if

10:15 15  you did, please show it to us -- listing consignment

10:15 16  goods, talking between the parties about consignment

10:15 17  goods, and moreover --

10:15 18      MR. VASEK: Well, we're entitled -- we're

10:15 19  entitled to seek that evidence from you from your

10:15 20  client.

10:15 21      MS. BIALZIK: But every single document -- or

10:15 22  every single product in our Summary Judgment Motion,

10:15 23  there's evidence supporting its delivery date. The only

10:15 24  issue in front of the Court here is the delivery date,

10:15 25  and we have the evidence supporting it; and to say that

Transcription of a Telephone Call - September 5, 2018

| | | |
|---|---|---|
| 10:15 | 1 | they -- |
| | 2 | (Simultaneous speaking.) |
| 10:15 | 3 | MR. VASEK: -- issue. If something was |
| 10:15 | 4 | delivered on consignment -- I mean, this contract also |
| 10:15 | 5 | says, until products consigned to account are implanted |
| 10:16 | 6 | or used by the account, all products shall remain the |
| 10:16 | 7 | sole and exclusive property of USC St. Jude. |
| 10:16 | 8 | That language, if you look at the UCCE, means |
| 10:16 | 9 | that St. Jude has a lien on these products, and you |
| 10:16 | 10 | don't get new value if you're extending secured credit. |
| 10:16 | 11 | You only are entitled to credit for new value for |
| 10:16 | 12 | extending unsecured credit. |
| 10:16 | 13 | MS. BIALZIK: One second. We didn't file a |
| 10:16 | 14 | financing statement. |
| 10:16 | 15 | MR. JOHNSON: Yeah. Where's the UCC1, Julian? |
| 10:16 | 16 | MR. VASEK: Well, I don't know. I haven't -- I |
| 10:16 | 17 | mean -- |
| 10:16 | 18 | MR. JOHNSON: Shouldn't that be in the Rule 26 |
| 10:16 | 19 | if you got a problem with that? |
| 10:16 | 20 | MR. VASEK: We need -- I'm sorry? |
| 10:16 | 21 | MR. JOHNSON: Shouldn't that have been in the |
| 10:16 | 22 | Rule 26 you provided, the UCC1 statement? |
| 10:16 | 23 | MR. VASEK: No, I don't think there is a UCC |
| 10:16 | 24 | financing statement, but I need to research whether this |
| 10:16 | 25 | kind of automatically -- |

14

Transcription of a Telephone Call — September 5, 2018

10:16 1       MS. BIALZIK: What about perfection? So none

10:16 2  of this -- then we're not perfected. I don't understand

10:16 3  what the point of the conversation is.

10:17 4       MR. VASEK: Well, I think that warrants further

10:17 5  research investigation. I don't know that it has to be

10:17 6  perfected in that manner. It's perfected by possession.

10:17 7       MR. JOHNSON: Is it?

10:17 8       MS. BIALZIK: Well, we didn't -- okay. So

10:17 9  either -- you're saying that we didn't have possession

10:17 10  but we had a lien, or you're saying we had possession --

10:17 11       MR. VASEK: I'm saying you had possession of it

10:17 12  until it went into someone's body.

10:17 13       MS. BIALZIK: Correct, and that was the date of

10:17 14  delivery.

10:17 15       MR. VASEK: Well, I don't know that you

10:17 16  provided anything of value, then. You've maintained a

10:17 17  lien on it until it was implanted into someone who was

10:17 18  at the hospital.

10:17 19       MS. BIALZIK: The date of new value is the date

10:17 20  of implantation for the goods that were hand-carry. So

10:17 21  that is the date of new value, and that's all consistent

10:17 22  with every document you have, with the sworn testimony

10:17 23  of Genovese, is all perfectly consistent.

10:17 24       MR. VASEK: And, look, if the emails -- if they

10:17 25  exist -- if they support that, then that's fine. I'm

Transcription of a Telephone Call - September 5, 2018

| | | |
|---|---|---|
| 10:17 | 1 | telling you -- I know you think we're being crazy here, |
| 10:18 | 2 | but we've -- when we send out 60 preference demands. |
| 10:18 | 3 | We've filed 20 adversary proceedings, and this is the |
| 10:18 | 4 | only one we're having an issue. |
| 10:18 | 5 | MR. JOHNSON: Yeah, but that's not a logical |
| 10:18 | 6 | argument, Julian. Every case is judged on its own |
| 10:18 | 7 | merit. So we know this one's a little different. |
| 10:18 | 8 | MR. VASEK: Well, and everyone else has |
| 10:18 | 9 | provided us with documentation we wanted. We walked |
| 10:18 | 10 | away from these. I mean -- |
| 10:18 | 11 | MS. BIALZIK: Well, we've provided the |
| 10:18 | 12 | documentation to support our defense. It's in front of |
| 10:18 | 13 | the Judge. We don't think -- we've provided you the |
| 10:18 | 14 | emails that we have. We can't provide things that don't |
| 10:18 | 15 | exist. |
| 10:18 | 16 | You can search your own emails if you think |
| 10:18 | 17 | there is court communications between the parties, and |
| 10:18 | 18 | all you -- you can't do it and then you say you want to |
| 10:18 | 19 | do a 56(d) response. Go ahead, you can do a 56(d) |
| 10:18 | 20 | response. We think it will fail, though, because you |
| 10:18 | 21 | can't articulate what you think might be out there that |
| 10:18 | 22 | would not be in the emails you have, because there's -- |
| | 23 | (Simultaneous speaking.) |
| 10:18 | 24 | MR. VASEK: We haven't de-archived all the |
| 10:18 | 25 | emails, and we can't afford to. We don't have the |

Julie Whaley & Associates
214-668-5578   JulieTXCSR@gmail.com

Transcription of a Telephone Call - September 5, 2018

10:18 1 money.

10:18 2     MS. BIALZIK: Well, you actually indicated to

10:18 3 us that you had de-archived the letters between Genovese

10:18 4 and the debtor, and you have Rick Leonard's, who was the

10:18 5 point person. So you --

10:18 6     MR. VASEK: We have archived Rick Leonard -- we

10:19 7 have archived Rick -- we don't have any way of

10:19 8 archiving emails that -- you archive an employee that --

10:19 9 excuse me. You de-archive an employee account.

10:19 10     So we can't Rick -- I mean, Genovese -- I mean,

10:19 11 if we de-archive Rick Leonard and he has the emails with

10:19 12 Genovese, we have those; but if Genovese has emails with

10:19 13 someone who the company hasn't de-archived, then we

10:19 14 don't have those.

10:19 15     MS. BIALZIK: Well, who -- I mean, but who

10:19 16 would that person be? I mean, if you don't even know

10:19 17 who that person might be, how are you expect -- you've

10:19 18 given us a list of 40 names. So search these 40

10:19 19 people --

10:19 20     MR. VASEK: Well, again, we can -- we can

10:19 21 search those for the accounts that have been

10:19 22 de-archived, but that's not -- necessarily turn up all

10:19 23 of their communications with the debtor. The debtor had

10:19 24 over 300 employees.

10:19 25     MS. BIALZIK: Well, if there were

Transcription of a Telephone Call - September 5, 2018

10:19  1    communications about this inventory, Rick Leonard would

10:19  2    have it because he's the point person.  We don't think

10:19  3    it's reasonable to think that some random person

10:19  4    would've been having communications on a central issue

10:19  5    when he was the point person.

10:19  6         Moreover, it would be in Genovese's email that

10:20  7    we have produced what we have of Genovese.  So we still

10:20  8    believe there's no reasonable basis to think that

10:20  9    there's more, and the reality is, there isn't.  I mean,

10:20 10    we can't produce more.  So if you think there's more,

10:20 11    your choice is to look at your own records.

10:20 12         MR. VASEK:  We've identified 40 people whose

10:20 13    emails you haven't searched, or some of them at least.

10:20 14    I mean, you haven't suggested a compromise of something

10:20 15    fewer than that.  I mean, look, there is an order.

10:20 16    There is a court order that overrules your objections

10:20 17    and requires you to search archive emails.

10:20 18         MR. JOHNSON:  It doesn't do totally that.  You

10:20 19    know that.

10:20 20         MS. BIALZIK:  Well, we complied with the court

10:20 21    order.  The court order was, I mean, if consistent with

10:20 22    the discussion that was on the record, which was a

10:20 23    limited discussion of specific -- I mean, Davor very

10:20 24    clearly said all he was asking for was a search of

10:20 25    specific identified salespeople, which is what we did.

Transcription of a Telephone Call - September 5, 2018

10:20 1        And more importantly, the thrust of the issues

10:21 2  in front of the Court that day were the ordinary course

10:21 3  issues, which are no longer part of this case. We

10:21 4  withdrew our 503(b)(9) claim. We withdrew our ordinary

10:21 5  course defense. We took all those issues off the table,

10:21 6  and so there is no longer any reason to be at random --

10:21 7  looking for random communications between the debtors.

10:21 8        It's got to be specific to the potential

10:21 9  consignment. Davor was clear on the record about the

10:21 10  fact that those would be emails with the on-the-ground

10:21 11  salespeople who were delivering product. We searched

10:21 12  for those emails. We produced it. We simply can't

10:21 13  produce what doesn't exist.

10:21 14        And to the extent that you think maybe there's

10:21 15  something more, you have a capability to look at the

10:21 16  records you do have and do exist, your emails of the

10:21 17  debtor, but --

10:21 18        MR. VASEK: Again, we don't.

10:21 19        MR. JOHNSON: And I would think that if you --

10:21 20  if you did have those documents, you would be highly

10:21 21  motivated to produce them so that you could

10:21 22  cross-examine somebody on deposition.

10:21 23        MR. VASEK: I'm telling you, we don't have all

10:21 24  of the emails. We can't afford to de-archive them.

10:21 25        MS. BIALZIK: Well, we don't -- I mean, you

Transcription of a Telephone Call - September 5, 2018

10:21 1 can -- then I guess that we're going to have to bring

10:21 2 that to the Court in the 56(d) motion.

10:22 3      MR. VASEK: The burden is way more for us than

10:22 4 you. Again, this is a huge, multibillion-dollar

10:22 5 corporation. It shouldn't be a big deal for them to

10:22 6 search whatever emails there are. I mean, again, I

10:22 7 don't think we've ever gotten in writing a clear

10:22 8 statement that once something is purged, it's gone

10:22 9 forever.

10:22 10      And if that's the -- if that's the case, I

10:22 11 think we've got spoliation issue. I don't think a

10:22 12 company that get -- literally gets sued every day, and

10:22 13 with respect to this debtor, knew long before the

10:22 14 petition date that there were issues.

10:22 15      MS. BIALZIK: Okay. Well, first of all,

10:22 16 spoliation only kicks in if you do not have access to

10:22 17 that information for another source, and here you do,

10:22 18 because you have emails.

10:22 19      And so, moreover, spoliation -- you can't have

10:22 20 a spoliation if you -- simply because of a corporate

10:22 21 policy that happens to be aggressive in purging.

10:22 22 There's numerous case law on that. They're allowed to

10:22 23 have whatever policies they want, and as long as they're

10:22 24 consistent and evenly applied --

10:22 25      MR. VASEK: Not if the policy is aimed at

Transcription of a Telephone Call - September 5, 2018

10:22  1    destroying the evidence.

10:22  2          MS. BIALZIK:  Well, you can go look at the case

10:23  3    law on that, because we're -- they're allowed to have a

10:23  4    corporate policy or -- and, moreover, there's no good

10:23  5    faith basis to believe that there could be emails that

10:23  6    contradict the clear and consistent evidence we have

10:23  7    provided about what was happening and delivery dates.

10:23  8          You have to have a good faith basis to think

10:23  9    there might be something out there that could contradict

10:23 10    it, and if you have that good faith basis, then search

10:23 11    your own emails, because you're not going to find

10:23 12    anything.

10:23 13          MR. VASEK:  And we got information from a --

10:23 14    from a former employee, and we have a contractor that

10:23 15    says this is a consignment agreement.  That's a good

10:23 16    faith --

      17                    (Simultaneous speaking.)

10:23 18          MR. VASEK:  -- basis.

10:23 19          MS. BIALZIK:  -- it's a consignment agreement

10:23 20    and said that they have that ability, and there's no

10:23 21    evidence that it was ever created.  In fact, there's

10:23 22    sworn testimony that it was not.  So --

10:23 23          MR. JOHNSON:  Are those two people, Julian,

10:23 24    identified in your disclosures?

10:23 25          MR. VASEK:  I'm sorry, Sam [sic].  I'm having a

Transcription of a Telephone Call - September 5, 2018

10:23  1   hard time understanding you.

10:23  2          MR. JOHNSON:  Sorry.  Are those two individuals

10:23  3   identified in your disclosure, sir?

10:23  4          MR. VASEK:  Who?

10:23  5          MR. JOHNSON:  The former employee and the

10:23  6   contractor you just spoke of.

10:24  7          MR. VASEK:  Well, I think the former employee

10:24  8   is Rick Leonard.

10:24  9          MS. BIALZIK:  Right.  And you -- we -- you have

10:24 10   it, and so those are the people you identified as people

10:24 11   with knowledge, and you have their email.

10:24 12          So, you know, it -- you know, we -- again, we

10:24 13   still would be willing to let you depose Mr. Genovese if

10:24 14   you need further explanation, but we can't produce

10:24 15   emails that don't exist, and you certainly are entitled

10:24 16   to bring a 56(d) response to our Motion for Summary

10:24 17   Judgment.

10:24 18          We don't think it's going to go anywhere

10:24 19   because we don't think you can articulate evidence that

10:24 20   you don't have access to that could possibly create a

10:24 21   dispute of fact with the clear and consistent delivery

10:24 22   date records that we have provided.

10:24 23          So we just don't think there's anything left

10:24 24   here, but you are -- you know, you -- certainly bring

10:24 25   your 56(d) response if you believe that you can

Transcription of a Telephone Call — September 5, 2018

10:24 1   articulate it.

10:24 2          MR. VASEK: Okay. So you're unwilling to

10:24 3   conduct any further search of those emails; is that

10:24 4   correct?

10:24 5          MS. BIALZIK: We've searched the salespeople,

10:24 6   so I don't see that there's anybody else you've

10:25 7   identified that would likely have -- and we searched

10:25 8   the -- accounts receivable or whatever guy.

10:25 9          Yeah, and we -- and we searched that -- you

10:25 10  know, the other people who would have knowledge of the

10:25 11  account, we searched those. So, you know, a random list

10:25 12  of employees -- I don't know who any of these people

10:25 13  are. We don't know why they would possibly -- possibly

10:25 14  have emails talking about a nonexistent consignment

10:25 15  inventory.

10:25 16          So if you want to identify, you know, one

10:25 17  person and explain that person's relationship to Walnut

10:25 18  Hill and the inventory, we certainly would like to

10:25 19  consider that; but right now we just have this long list

10:25 20  of random names of people who, as far as we know,

10:25 21  wouldn't have any knowledge.

10:25 22          MR. VASEK: Okay. Well, we don't have it,

10:25 23  either --

        24                          (Simultaneous speaking.)

10:25 25          MR. VASEK: -- but that's the point of

Transcription of a Telephone Call - September 5, 2018

10:25  1    searching their emails.  I mean -- I mean, we're

10:25  2    entitled to this discovery.  I don't -- it's mind-

10:25  3    boggling that St. Jude refuses to engage --

10:26  4            MS. BIALZIK:  We have provided you the

10:26  5    discovery we have.  We did searches of all the

10:26  6    salespeople you identified, consistent with what Davor

10:26  7    said he was looking for.  He was very clear on the

10:26  8    record that what he was looking for was the identified

10:26  9    individual and searching their emails, which is what we

10:26 10    did.

10:26 11            MR. VASEK:  Okay.  Well, let me ask you this,

10:26 12    then.  If I sent you some new document requests that are

10:26 13    much more specific and identify these individuals, are

10:26 14    you going to object to them?

10:26 15            MS. BIALZIK:  Well, to the extent that -- you

10:26 16    know, it seems to me that you said the original reason

10:26 17    you needed these general communications was the ordinary

10:26 18    course and --

10:26 19            MR. VASEK:  That's -- no, that's not the -- the

10:26 20    consignment issue was discussed plenty at the hearing.

10:26 21            MS. BIALZIK:  Well, when it was discussed, on

10:26 22    it was discussed related to the specific on-the-ground

10:26 23    salespeople.  It was very confined to those on-the-

10:26 24    ground salespeople.  We have searched every single one

10:26 25    of their emails already.

Transcription of a Telephone Call - September 5, 2018

10:26  1          So unless you can articulate how one of these

10:26  2   people would have been relate -- you know, involved with

10:26  3   a consignment inventory in some meaningful way, we don't

10:26  4   see that this is a reasonable request.

10:26  5          It's not proportional to what -- we provided

10:27  6   evidence, clear evidence, of the list you gave.  It's

10:27  7   not proportional to go on a fishing expedition for

10:27  8   things that you have no reasonable belief exists and

10:27  9   could contradict the evidence we've provided.

10:27 10          MR. VASEK:  I have a reasonable belief that

10:27 11   these things exist.

10:27 12          MS. BIALZIK:  Well, we don't --

10:27 13          MR. VASEK:  I've explained why.  You disagree.

10:27 14   That's fine.  The Court already agreed that this

10:27 15   contract and -- and the statement that Davor received

10:27 16   from the employee are enough to justify discovery on

10:27 17   consignment.  He's found that.

10:27 18          MS. BIALZIK:  He found that because there was

10:27 19   no Summary Judgment Motion in front of him, and he

10:27 20   wasn't -- didn't have the merits up in front of him.

10:27 21   Now that he's got the merits in front of him and he can

10:27 22   see that this is not proportional and that there's

10:27 23   plenty of evidence that is there, it's just -- I mean,

10:27 24   again, came up very specifically that the merits were

10:27 25   not in front of him.

Transcription of a Telephone Call - September 5, 2018

10:27  1          The merits are now in front of the Court, and
10:27  2    we are asking him to consider discovery in line with the
10:27  3    merits; and that's why -- again, if you want to bring a
10:27  4    56(d), if you can articulate something more than a
10:27  5    random statement to Davor that's not even under oath,
10:28  6    that is incredibly vague -- you've got to have something
10:28  7    more than that.  And --
       8                      (Simultaneous speaking.)
10:28  9          MS. BIALZIK:  -- something more than that, as
10:28 10    well, we'll -- we will look at it.  We are willing to
10:28 11    dispart our new value defense in a meaningful way on the
10:28 12    merits.  We've always been willing to do that, but you
10:28 13    have --
10:28 14          MR. VASEK:  But we can't -- we can't have a
10:28 15    meaningful discussion without seeing the emails.  We
10:28 16    can't have meaningful settlement negotiations when we
10:28 17    believe that St. Jude is either withholding evidence or
10:28 18    destroying evidence.  I mean, we can't --
10:28 19          MS. BIALZIK:  You have no reason to believe
10:28 20    that we are withholding or destroying.  We've produced
10:28 21    what we have, and that does not --
10:28 22          MR. VASEK:  I do.  A 30-day policy, to me, is
10:28 23    intentional destruction of evidence.
10:28 24          MS. BIALZIK:  The entire corporate policy of 30
10:28 25    days is intentional, that's your position?  Well, you

Transcription of a Telephone Call - September 5, 2018

10:28  1    can bring that to the Court, because we have plenty of
10:28  2    case law that says that's simply not the case.
10:28  3            So if that's your position that Abbott's entire
10:28  4    policy is a willful intent to destroy evidence that
10:28  5    might be relevant to this specific case, then I would
10:28  6    say I think you're -- there's no way that that would --
10:28  7            MR. VASEK:  I can't imagine a legitimate reason
10:28  8    for the policy when the company gets sued every day, and
10:29  9    I can't imagine why -- I mean, as far as I know, there
10:29 10    was no litigation hold notice when there definitely
10:29 11    should have been months before the petition date.
10:29 12            MS. BIALZIK:  None of this evidence is -- first
10:29 13    of all, the Federal Rules require proportionality.
10:29 14    Again, we've narrowed the issues.  We've removed
10:29 15    ordinary course.  We've created a clear record that the
10:29 16    Court -- entirely our new value defense.  You haven't
10:29 17    said anything about the documents we provided.
10:29 18            You haven't suggested why anything that we've
10:29 19    said is not showing what we said it shows, because it
10:29 20    clearly is.  We have delivery dates.  That's the issue.
10:29 21    It's in front of the Court on the merit.  You know,
10:29 22    we're -- that's what we're focused on and that's what
10:29 23    the Rules -- you know, we've more than met our burden
10:29 24    under the Rules.
10:29 25            And given the issues that remain and what's in